UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
MILANA DRAVNEL,

        *Plaintiff*,

– against –

OSCAR DE LA HOYA, and JOHN and/or JANE DOES 1&2,

        *Defendant.*
------------------------------------------------------X

07 CIV 10406 (LTS)

**DECLARATION OF STEPHEN ESPINOZA**

**STEPHEN ESPINOZA** hereby declares under penalty of perjury:

1. I am an attorney duly admitted to the California Bar. For the past seven years, I have represented Oscar de la Hoya with respect to many of his business affairs.

2. In September of 2007, I became aware that someone was claiming to have photographs of Mr. de la Hoya in embarrassing poses and was offering such photographs for sale. Shortly thereafter, x17online.com ("x17") posted photographs which x17 stated "appear[ed] to be" of Mr. de la Hoya. It was subsequently reported by x17 and other media that Ms. Dravnel had provided the photographs to x17.

3. Mr. de la Hoya, through counsel, responded by publicly stating that the x17 photographs were fake and that the matter was being referred to his legal counsel.

4. Shortly thereafter, Ms. Dravnel contacted one of Mr. de la Hoya's colleagues and requested a meeting with Mr. de la Hoya or one of his representatives to discuss how she could recant her claim that the photos were genuine.

1

5.  On September 23, 2007, Glenn Bunting (a publicist for Mr. de la Hoya) and I met with Ms. Dravnel and her friend, Richard Rubino. The meeting took place in New York City. It is again important to emphasize that this meeting took place because Ms. Dravnel requested it.

6.  The meeting commenced at approximately 1:00 p.m. and lasted until approximately 6:30 p.m. At the outset, Ms. Dravnel and Mr. Rubino confirmed Ms. Dravnel's intention to publicly retract her previous statements that the photos of Mr. de la Hoya were genuine. They informed me that Ms. Dravnel was frightened that if she retracted her previous claims that the photos were genuine, she would then be sued by both Mr. de la Hoya and x17, and potentially other parties as well.

7.  Ms. Dravnel then requested that Mr. de la Hoya agree to forego suing her and to indemnify her from third party lawsuits resulting from her decision to retract her prior statements. In response, I made it clear that, although Mr. de la Hoya would never pay Ms. Dravnel to stop or hinder publication of the photographs, he would be willing to forego suing her and also indemnify her so long as he had assurances (a) that Ms. Dravnel would agree to strict confidentiality both with respect to the settlement and any dealings she may have had with Mr. de la Hoya, (b) that she would not in any way seek to advance her own interests through press interviews, the use of Mr. de la Hoya's name or any images of him that she might claim to possess, (c) that we agree on a liquidated damages provision to deter her from breaching her obligations of confidentiality, and (d) that Mr. de la Hoya and Ms. Dravnel would exchange releases.

8.      Ms. Dravnel and Mr. Rubino agreed to these terms in principle, and I drafted an agreement documenting these terms. I am informed that Ms. Dravnel and Mr. Rubino claim that the agreement she ultimately signed was thrust upon her with no opportunity to negotiate. This is completely untrue. Rather, as shown by Exhibit A hereto, the agreement was modified during our discussions. For example, as shown by Exhibit A, the agreement provides for Ms. Dravnel to pay $25,000 in liquidated damages each time she breaches the agreement, whereas Mr. de la Hoya is obligated to pay liquidated damages of $250,000 each time he breaches. The $250,000 figure for Mr. de la Hoya was inserted at Ms. Dravnel's and Mr. Rubino's request. Further, as shown by Exhibit A, it was Ms. Dravnel and Mr. Rubino who asked that the provision for disputes to be resolved in California under California law be replaced by a provision calling for dispute resolution in New York under New York law. In the process of discussing this provision, Ms. Dravnel and Mr. Rubino expressly stated that they agreed that private, confidential and binding arbitration would be in the best interests of both parties (*i.e.*, Ms. Dravnel and Mr. de la Hoya).

9.      Significantly, I asked both Ms. Dravnel and Mr. Rubino numerous times whether Ms. Dravnel had a lawyer and, if she did, how I could fax or e-mail him the various drafts or speak with him directly. On each occasion, I was rebuffed.

10.     As the end of the afternoon approached, we still did not have a signed agreement. Nonetheless, Ms. Dravnel made an independent decision to conduct an interview with a *New*

*York Daily News* reporter in which she acknowledged that she could not verify the authenticity of the photos sold to x17.

11.     Following her interview with the reporter, somewhere around 6:30 p.m., Ms. Dravnel and Mr. Rubino informed me that they wanted to review the last draft of the agreement before deciding what to do, and they left.

12.     A couple of hours later, Mr. Rubino called me on my cell phone to inform me that Ms. Dravnel wanted to sign the last draft of the agreement in order to confirm the agreement between the parties. I then agreed to meet them at my hotel. Mr. Rubino called me again when they arrived outside the hotel, and I agreed to go outside to meet them.

13.     When I came out to the street, Ms. Dravnel and Mr. Rubino were waiting by Mr. Rubino's car. I handed them a clean copy of the agreement to sign. At this point, Mr. Rubino [Ms. Dravnel's friend] stated that he and Ms. Dravnel wanted to show the agreement to an attorney solely for the purpose of seeing if any language needed to be clarified, and not to decide whether to enter into the agreement. Moreover, Mr. Rubino explicitly told me that I would hear from an attorney the next morning only if there were some language issues. That is the reason I hand-wrote in "Subject to further review by MD's Attorney" above the signature line for Ms. Dravnel.

14.     Prior to her signing, I explicitly told Ms. Dravnel that she did not have to sign the agreement at that point, and that if she had an attorney, she should have it reviewed by the

4

attorney before signing it. I made it crystal clear that Mr. de la Hoya would still be willing to sign the agreement the following day. Ms. Dravnel refused this offer and signed.

15. As we left each other, there was absolutely no doubt about the facts that (a) Ms. Dravnel and I had reached agreement, (b) she would be speaking to an attorney only for the purpose of determining if any language changes were needed to clarify the agreement, and (c) I would hear from that attorney the next morning only if there were any drafting issues.

16. No lawyer representing Ms. Dravnel ever called me the next day or at any time thereafter concerning the agreement she had signed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 7th day of January, 2008 in Los Angeles, California.

_____
STEPHEN ESPINOZA

EXHIBIT A

EXHIBIT A

## AGREEMENT

The following sets forth the terms of the agreement ("Agreement"), dated as of September 22, 2007, between Malina Dravnel ("MD") and Oscar De La Hoya ("DLH"). In consideration of the reciprocal commitments and mutual benefits hereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

0.   MD acknowledges that she, on her own initiative, approached DLH's representatives and initiated the discussions which have resulted in this Agreement. MD acknowledges that the purpose for initiating contact with DLH's representative was to advise them of her intention to publicly recant and retract her prior public statements regarding DLH and to publicly announce that the images that had been previously posted to the internet had been taken from MD's camera by a third party without her consent and had been altered and to seek DLH's consent and approval of her public statement(s) ((collectively, the "Statements"). MD acknowledges that she has not requested, nor has DLH agreed, to pay or to cause any other party to pay to her, any financial compensation in connection with this Agreement or otherwise as consideration for the Statements.

1.   MD represents and warrants that she has not entered into any agreement with any third party regarding DLH, or any photograph or image purporting to depict DLH, other than X17. Pursuant to MD's request, but subject to MD actually publicly making the Statements as mutually agreed by MD and DLH, DLH: (a) shall indemnify MD against all reasonable legal fees paid or incurred by MD for the defense of any third party lawsuit, whether filed domestically and/or internationally, against MD at any time after the date hereof, worldwide, claiming that the Statements constitute a breach of an agreement between MD and a third party; and (b) agrees not to file or pursue any lawsuit against MD arising out of any publication of photographs or interviews given by MD which occurred prior to the date hereof. MD agrees not to file or pursue any lawsuit against DLH arising out of any matter which has occurred prior to the date hereof.———

3.   MD shall keep this Agreement and the terms hereof strictly confidential. Without limiting the generality of the foregoing, MD shall not use, divulge, disseminate, discuss, refer to or, acknowledge the existence of, publish, reproduce or otherwise disclose (or authorize or permit any third party to do any of the above): (a) this Agreement or the terms hereof; (b) any information regarding DLH; or (c) any photographs or images of DLH. In addition, after the date hereof MD shall not, without DLH's prior written consent, grant or participate in any interviews or articles, make any public statement or otherwise discuss or divulge any information regarding DLH. In the event of any -breach or violation by MD of the terms of this Paragraph 3, then DLH shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $25,000 for each violation hereof. Likewise in the event of any breach or violation by DLH of DLH's obligations pursuant to Paragraph 2, then MD shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $250,000 for each violation hereof. In addition, MD agrees that In the event of any breach, alleged breach or violation of the terms of this Paragraph 3, then DLH shall sustain irreparable damage and damage which is difficult, and DLH shall therefore be entitled to injunctive and/or other equitable remedy to prevent and/or remedy any such breach or violation, and MD agrees not to oppose any such injunctive or other equitable remedy.

4. Notwithstanding anything to the contrary contained herein, and without prejudice to any other remedies set forth herein or otherwise at law or in equity, <u>DLH's obligations under</u> Paragraph 2 shall be null and void, and DLH shall be fully released from all <u>of his</u> covenants and obligations thereunder, in the event of any breach, alleged breach or violation by MD of the terms of Paragraphs 2 <u>or</u> ~~and~~ 3 above.

5. This is the entire agreement between MD and DLH regarding the subject matter hereof. <u>MD acknowledges</u>~~MD acknowledged~~ that neither DLH nor any other party has made any promises to her other than those contained in this Agreement. This Agreement may not be amended or modified in any way, except pursuant to a written instrument signed by both parties. MD acknowledges that she has been ~~advise~~<u>advised</u> to consult with an attorney before signing this Agreement and that she has had a reasonable opportunity to do so.

6. Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any applicable law, ~~rule or regulation,~~ and if there shall exist any conflict between any provision of this Agreement and any such law, ~~rule or regulation,~~ the latter shall prevail and the pertinent provision or provisions of this Agreement shall be curtailed, limited or eliminated to the extent necessary to remove such conflict, and as so modified, this Agreement shall continue in full force and effect. In the event that one or more of the provisions of this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be in any way affected or impaired thereby.

7. This Agreement shall be governed by and construed in accordance with the internal laws of the State of <u>New York</u>~~California~~ applicable to agreements made and to be fully performed therein. Any and all disputes, claims, controversies and actions hereunder shall <u>be resolved by private, confidential arbitration in New York, NY pursuant to the rules of JAMS. Each party shall have a right of appeal to a three-arbitrator panel, which appeal shall also be conducted by private, confidential arbitration in accordance with the rules of JAMS</u>~~subject to exclusive venue and jurisdiction of the state and federal courts sitting in the County of Los Angeles~~.

<u>MD ACKNOWLEDGES</u>
~~YOU ACKNOWLEDGE~~ THAT <u>SHE HAS</u>~~YOU HAVE~~ CAREFULLY READ THIS AGREEMENT<u>,</u> <u>UNDERSTANDS</u> ~~AND RELEASE, UNDERSTAND~~ IT, AND <u>IS</u>~~ARE~~ VOLUNTARILY ENTERING INTO IT OF <u>HER</u>~~YOUR~~ OWN FREE WILL, WITHOUT DURESS OR COERCION, AFTER DUE CONSIDERATION OF ITS TERMS AND CONDITIONS. <u>MD</u>~~YOU~~ FURTHER ACKNOWLEDGE<u>S</u> THAT EXCEPT AS STATED IN THIS AGREEMENT, <u>NEITHER DLH NOR</u> ~~THE COMPANY OR~~ ANY REPRESENTATIVE OF <u>DLH</u>~~THE COMPANY~~ HAS MADE <u>ANY</u>~~NO~~ OTHER REPRESENTATIONS OR PROMISES TO <u>HER</u>~~YOU~~.

_____   _____
Milana Dravnel                Oscar De La Hoya
                              <u>By Stephen Espinoza, Authorized Representative</u>
Date:_____            Date:_____

- 2 -

- 3 -

AGREED AND ACCEPTED, AS TO THE CONFIDENTIALITY PROVISIONS OF PARAGRAPH 3 ONLY:

_____

Richard Rubino