UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MILANA DRAVNEL,

                *Plaintiff*,

– against –

OSCAR DE LA HOYA, and JOHN and/or JANE
DOES 1&2,

                *Defendants.*
------------------------------------------------------------X

Case No.: 07-cv-10406

Hon. Laura T. Swain

## DECLARATION OF JUDD BURSTEIN

**JUDD BURSTEIN, ESQ.**, hereby declares under penalty of perjury:

1)    I am an attorney duly admitted to practice before the Bar of this Court.

2)    I represent Defendant Oscar De La Hoya ("Defendant") in this action.

3)    I submit this Declaration in support of Defendant's Motion to Dismiss the Amended Complaint.

4)    The purpose of this Declaration is to authenticate a certain document referred to in the accompanying Memorandum of Law in Support of the Motion to Dismiss submitted on behalf of Defendant.

5) Annexed hereto as Exhibit A is a true and accurate copy of the Amended Complaint, dated January 2, 2008, filed in this action.

**WHEREFORE**, your Declarant prays for an Order granting Defendant's Motion to Dismiss the Amended Complaint.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 8th day of January, 2008, in New York, New York.

_____
JUDD BURSTEIN

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MILANA DRAVNEL,

                              Plaintiff,

    -against-

OSCAR DE LA HOYA, and
JOHN and/or JANE DOES 1 & 2,

                              Defendants.
-------------------------------------------------------------X

**AMENDED COMPLAINT and
DEMAND FOR JURY TRIAL**

Hon. Laura T. Swain
Case No.: 07-cv-10406

MILANA DRAVNEL, by her attorneys SALVATORE STRAZZULLO and STRAZZULLO LAW FIRM, as and for her complaint against Defendants, based upon personal knowledge with respect to herself and on information and belief with respect to all other matters, alleges as follows:

### JURISDICTION and VENUE

1. Plaintiff MILANA DRAVNEL (hereinafter "DRAVNEL") is a resident of the County of Kings, State of New York.

2. Upon information and belief, the defendants reside in California.

3. The amount of the controversy exceeds the sum of Seventy-Five Thousand Dollars.

4. The transactions at issue in this Complaint occurred in the County of New York, State of New York, thus venue is within the Southern District of New York.

## THE PARTIES AND DEFENDANT DE LA HOYA'S AGENTS

5. Plaintiff emigrated from Russia to the United States, is twenty-two years old, has just a high school education and is employed as a dancer and model.

6. Defendant De La Hoya is a world famous boxer and champion, and a successful businessman. He is the owner of Golden Boy Enterprises, which owns various publishing enterprises, and Golden Boy Promotions, a national boxing promotional firm.

7. Stephen Espinoza is one of De La Hoya's attorneys, and at all times acted within the scope of his employment as attorney for De La Hoya. Espinoza at all times acted as agent of Defendant De La Hoya.

8. Jack Tiernan, Debbie Kaplan, and Glen Bunting are publicists employed by De La Hoya, and at all times acted within the scope of their employment as publicists for De La Hoya and as agents of Defendant De La Hoya.

9. Upon information and belief, Raul Lnu is De La Hoya's boxing agent, and at all times acted within the scope of his employment as De La Hoya's agent, and acted in a principal-agent capacity.

## RELEVANT FACTS

10. On or about the weekend of September 28, 2006, Defendant De La Hoya got together with Plaintiff in New York City.

11. Over the next months, at various times, and in different locations, Plaintiff met De La Hoya, at his request.

12. From September 2006 through May 2007, Plaintiff and De La Hoya engaged in a personal relationship, and spoke often via cell phones or text messaging.

13. From their time together, it was apparent to Plaintiff that De La Hoya was a wealthy and powerful person.

14. During the time Plaintiff and De La Hoya spent time together, Plaintiff told De La Hoya personal information about her family and circumstances. In particular, he knew Plaintiff and her family had emigrated from Russia, and that she was in the process of seeking her citizenship.

15. During various times that the parties were together, photographs ("the photographs") were taken of De La Hoya with his knowledge, participation, and consent.

16. On or about September 16, 2007, Plaintiff was approached to sell the photographs taken of De La Hoya.

17. Thereafter, De La Hoya together with his agents, specifically Raul Lnu, Espinoza, and Bunting, and others, made efforts to place undue influence and pressure on Plaintiff to deny the authenticity of the photographs, and to prevent her from releasing the photographs to the public.

18. Further, in the following days and weeks, De La Hoya, through Raul Lnu and others, began a campaign to locate, harass, intimidate and coerce Plaintiff.

19. For instance, Plaintiff began receiving repeated cell phone calls from representatives of De La Hoya conducted in a frightening manner.

20. In addition, Plaintiff learned from her former employer that someone was anonymously calling at her place of employment and trying to locate her.

21. Plaintiff also received a call on her cell phone from someone who identified himself as a Spanish news reporter interested in purchasing photographs of De La Hoya – yet, to Plaintiff's knowledge, no one possessed that cell phone number of Plaintiff's other than De La Hoya.

22. In addition, a friend of Plaintiff's, who was aware of the existence of the photographs, received a telephone call from a person who identified himself as an agent of the F.B.I., and asked where Plaintiff lived. The caller was threatening, intimating that he was investigating a crime in which Plaintiff was involved and that Plaintiff would be arrested.

23. Additionally, Raul Lnu, acting in the interests of De La Hoya, repeatedly questioned Plaintiff's friend about the kind of car Plaintiff drove and where she lived.

24. As a result, Plaintiff was made aware that De La Hoya and his representatives were actively looking for her, seeking possession of the photographs by various means.

25. On or about September 18, 2007, X17, an on-line celebrity news site, agreed and did purchase the photographs of Defendant De La Hoya from Plaintiff. Further, Plaintiff entered an agreement with X17 regarding the selling of

additional interviews to other media outlets, and a publicity schedule was created.

26. Plaintiff also entered into an agreement with R. Couri Hay Creative Public Relations, a world famous public relations firm that represents sports figures, models, and other famous people of interest.

27. As part of the agreements with X17 and R. Couri Hay Creative Public Relations, Plaintiff appeared and was interviewed on Entertainment Tonight, a celebrity news television channel, regarding the photographs, and portions of the interview were broadcast at various intervals that September week.

28. After Plaintiff's interview was aired on television, she and/or her representatives began receiving calls from other large entertainment media groups, which made expressed specific interest in interviewing Plaintiff regarding the photographs. For example, Playboy Magazine, Maximum Magazine, OK Magazine, and the Inquirer expressed interest in interviewing Plaintiff and purchasing the photographs.

29. R. Couri Hay Creative Public Relations was also working on book, movie and other sponsorship deals regarding the photographs on behalf of Plaintiff.

30. During this time, Defendant De La Hoya and his representatives threatened to interfere with her pending United States citizenship application in retribution, and to prevent further publication of the photographs.

5

31. Defendant De La Hoya also publicly threatened legal action regarding the use of the photographs.

32. Plaintiff became frightened, distraught, emotionally fragile, and unable to eat during this period of time.

33. Fearing retaliation, Plaintiff agreed to meet representatives of Defendant De La Hoya's who indicated that they wanted to prevent further dissemination of the photographs.

34. On or about September 23, 2007, De La Hoya's attorney, through his representatives Stephen Espinoza, an attorney, and Greg Bunting, a publicist, met Plaintiff at offices of Defendant's representatives in Manhattan. Plaintiff brought a friend to that meeting.

35. During the meeting, Espinoza spoke with Defendant De La Hoya on the telephone numerous times. They discussed various versions of events and information that Plaintiff could disseminate to the media regarding the photographs.

36. As a consequence of Espinoza's, Bunting's and De La Hoya's coercive tactics, Plaintiff felt compelled to announce through the media, falsely, that the photographs were fabricated, altered, and were not genuine depictions of people or events.

37. Defendant De La Hoya, Espinoza and Bunting coerced Plaintiff to renounce the genuineness of the photographs even though Defendant knew that this was

a false statement, and that the photographs had not been altered and were genuine.

38. In furtherance of their efforts to coerce Plaintiff to deny falsely the authenticity of the photographs, and thereby relinquish any rights and benefits she had in relation to the photographs, Espinoza, Bunting, and De La Hoya prepared a written statement for Plaintiff to read to the press. The statement required Plaintiff to declare falsely that she could not verify the authenticity of the photographs and that she had been pressured into going public with the photographs by certain individuals who had improper motives.

39. Espinoza and Bunting instructed Plaintiff that they would telephone the media, and she should read the false statement that they had prepared for her disavowing the authenticity of the photographs.

40. Espinoza and Bunting contacted a Daily News reporter and supervised Plaintiff as she read the statement that they had prepared.

41. As a result of the false statements Plaintiff was coerced into making, Plaintiff lost specific business opportunities and suffered monetary damages.

42. Defendant De La Hoya, through his agents Espinoza and Bunting, had knowledge of these interview offers and business opportunities.

## FIRST CAUSE OF ACTION

### (Tortious Interference With Business Relations)

43. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

44. Various media entities sought to interview Plaintiff regarding the photographs, for which Plaintiff would be compensated.

45. However, once Defendant coerced Plaintiff to state, falsely and publicly, that the she could not verify the authenticity of the photographs, those contracts and business opportunities were voided by those media entities.

46. Defendant maliciously, knowingly, and intentionally interfered with the negotiations or prospective contracts of Plaintiff with third parties. Were it not for Defendant's improper interference, Plaintiff would have had economic opportunities from which she would have profited.

47. Plaintiff suffered special and compensatory monetary damages from Defendant's acts in the amount of five million dollars ($5,000,000).

## SECOND CAUSE OF ACTION

### (Tortious Interference with a Contract)

48. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

49. Plaintiff had a contract with X17 whereby X17 would sell the photographs to interested parties, and Plaintiff would receive proceeds from the sale of the photographs.

50. That contract was rescinded as a direct result of Defendant and his agents coercing Plaintiff to represent, falsely, to X17, and other media outlets, that the photographs were not genuine depictions of people or events.

51. Because of Defendant's and his agents' malicious, intentional, and improper interference with Plaintiff's contract with X17, she suffered special and compensatory monetary damages of five million dollars ($5,000,000).

### THIRD CAUSE OF ACTION

**(Intentional Infliction Of Emotional Distress)**

52. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

53. Defendant and his agents deliberately conducted a campaign of harassment and intimidation against Plaintiff.

54. Defendant's extreme and outrageous conduct in intimidating her and ultimately coercing her for their own purposes, was specifically intended to cause Plaintiff severe emotional distress, and did cause her extreme emotional distress.

9

55. In turn, Plaintiff's extreme emotional distress caused by Defendant's and his agents' conduct prompted her to retract her previous, truthful assertions regarding the photographs, and to declare falsely that the photographs were not genuine depictions of people or events.

56. As a result of Defendant's and his agents' conduct, Plaintiff has suffered extreme mental anguish, to her damage, in the amount of five-million dollars ($5,000,000).

## FOURTH CAUSE OF ACTION

### (Defamation)

57. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

58. Defendant and his agents maliciously and willfully entered into a scheme to defame and injure Plaintiff in her good name and reputation.

59. Defendant and his agents slandered Plaintiff by stating through the media that Plaintiff had released fake photographs of Defendant De La Hoya. Defendant and his agents stated those things about Plaintiff despite that they knew that said statements were untrue, causing injury to Plaintiff.

60. Defendant and his agents slandered Plaintiff by stating through the media that she had published and disseminated the photographs when she knew those photographs were not genuine depictions of people or events. Defendant and

his agents stated those things about Plaintiff despite that they knew they were untrue, causing injury to her.

61. In addition, Defendant and his agents coerced Plaintiff, by intimidating and threatening her through various means, to state through the media that she could not personally verify that the photographs were genuine depictions of people or events, despite that Defendant and his agents knew that this was not true. This too caused injury to the Plaintiff.

62. Specifically Defendant and/or his agents, made the following statements, knowing them to be false:

   (a) On or about September 19, 2007, Defendant De La Hoya's agent Jack Tiernan issued a statement to the press that "They're [the photographs] completely manufactured. The pictures have been manipulated or manufactured, and the matter has been referred to his [De La Hoya's] attorney." Tiernan further stated to the press that he had spoken with De La Hoya about the photographs and that De La Hoya had "said as much." These statements were published by Radar online and other internet and press media.

   (b) On or about September 19, 2007, Defendant De La Hoya's representative, Debbie Caplan, stated to the press that the photographs were "photoshopped" and that "They're not real." This statement was published by the New York Daily News.

   (c) On or about September 19, 2007, Defendant De La Hoya's attorney, Bertram Fields, issued a statement to the press that "The photographs depicting Mr. De La Hoya's image that were posted online today by an obscure paparazzi website are fake. Many of the website's viewers identified the photos as a 'really bad photoshop job.' Unfortunately, with today's technology, anyone can make any photo seem like something other than it is." This statement was published by repeatedly by the media, including but not limited to www.towleroad.com, radaronline.com, OG Paper, tmz.com, and popcrunch.com.

11

(d)    On or about September 19, 2007, Defendant De La Hoya's attorney, Bertram Fields, released a statement to the media that "He [Oscar] assures me the photographs are phony. He has asked me to pursue his legal remedies." This statement was widely sent to the media by Defendant, and specifically published by the New York Daily News, the National Ledger, and Access Hollywood.

(e)    On or about September 19, 2007, Defendant De La Hoya's representatives stated to "Extra's" Mario Lopez, that the photographs were fake. This statement was repeated by the reporter on the internet and on the television.

(f)    On or about September 22, 2007, Defendants and/or their agents stated to the media that Plaintiff wanted to "publicly announce that the images that had been previously posted to the internet had been taken from [DRAVNEL'S] camera by a third party without her consent and had been altered. . .;" and compelled Plaintiff to make a false statement to a New York Daily News reporter, that "I cannot personally verify the authenticity of the images of Oscar De La Hoya that have been shown on television. These images were taken from my personal camera and were out of my control."

(g)    On or about September 25, 2007, Defendant De La Hoya stated to the press that "These pictures are obvious fabrications." This statement was published by the New York Post.

(h)    On or about September 27, 2007, Defendant De La Hoya stated to reporter Mark Steines from "Entertainment Tonight" that "these [photographs] are fake, these are Photoshopped." This information was republished on various internet publications.

(i)    On or about September 28, 2007, Defendant De La Hoya appeared on Entertainment Tonight and The Insider, national television shows, and stated the photographs were fake and photoshopped.

(j)    On or about September 26, 2007, Defendant De La Hoya, through his attorney, Bertram Fields, released a statement to the press stating, "The woman who purportedly took the photographs has stated publicly she cannot confirm that the images have been posted, published and broadcast are genuine. A well known and independent photograph forensic expert has stated his opinion that the photographs are fake,

     which is what Oscar De La Hoya has been saying all along." This statement was published by various news outlets, including the National Ledger.

63. Defendant's and his agents' defamatory statements injured Plaintiff's personal reputation and good name, to her damage, in the sum of $5,000,000.

## FIFTH CAUSE OF ACTION

### (Product Libel)

64. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

65. Defendant and his agents maliciously and willfully entered into a scheme to defame and injure the value of the photographs, thus destroying Plaintiff's business opportunities.

66. Defendant and his agents stated to the media that Plaintiff had published and disseminated the photographs when she knew those photographs were not genuine depictions of people or events. Defendants stated those things about the photographs even though they knew the statements were untrue, causing injury to the value or marketability of those photographs.

67. Defendant's and his agents' defamatory statements about the photographs injured the value of the photographs and injured Plaintiff's business opportunities, all to Plaintiff's damage, in the sum of $5,000,000.

13

## FIFTH CAUSE OF ACTION

### (Defamation By Compelled Self-publication)

68.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

69.  Defendant and his agents intentionally and maliciously sought to destroy Plaintiff's reputation and good-name and expose her to public contempt, ridicule and disgrace, and to charge that Plaintiff was a liar and dishonest person, when they, directly and indirectly, coerced her to state through the media, that she had lied about the authenticity of the photographs and the truthfulness of her prior public statements about the photographs.

70.  Defendant and his agents were aware that their actions would compel Plaintiff to renounce the authenticity of the photographs as well as her previous statements.

71.  Defendant's and his agents' compelled defamatory statements injured Plaintiff's personal reputation and good name, to her damage, in the sum of $5,000,000.

**WHEREFORE**, Plaintiff **MILANA DRAVNEL** demands judgment as follows:

   (a)   on the First Cause of Action of Tortious Interference With Business Relations, Plaintiff is entitled to special and compensatory damages in an amount to be determined at trial, but not less than Five-Million

14

        Dollars ($5,000,000) and punitive damages in an amount to be determined at trial, but not less than five million dollars ($5,000,000);

(b)    on the Second Cause of Action of Tortious Interference with Contract, Plaintiff is entitled to special and compensatory damages in an amount to be determined at trial, but not less than Five-Million Dollars ($5,000,000) and punitive damages in an amount to be determined at trial, but not less than five million dollars ($5,000,000);

(c)    on the Third Cause of Action of Intentional Infliction of Emotional Distress, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but not less than five-million dollars ($5,000,000);

(d)    on the Fourth Cause of Action of Defamation, Plaintiff is entitled to special damages and compensatory damages in an amount to be determined at trial, but not less than five million dollars ($5,000,000); and punitive damages in an amount to be determined at trial, but not less than five-million dollars ($5,000,000);

(e)    on the Fifth Cause of Action of Product Libel, Plaintiff is entitled to special and compensatory damages in an amount to be determined at trial, but not less than five-million dollars ($5,000,000).

### Jury Demand

Plaintiff demands a jury trial.

Dated: New York, New York
January 2, 2008

Yours, etc.
STRAZZULLO LAW FIRM

By: _____
Salvatore Strazzullo, Esq. (SS 7419)
100 Park Avenue, Suite 1600
New York, New York 10017
Tel: (212) 551-3224
Fax: (212) 926-5001
*Attorneys for Plaintiff Milana Dravnel*

TO:   Judd Burstein, Esq.
      Judd Burstein, P.C.
      1790 Broadway, Suite 1501
      New York, New York 10019
      Tel:   (212) 974-2400
      Fax:   (212) 974-2944

      -AND-

      Greenberg Glusker
      Bertram Fields, Esq.
      Jeffrey Spitz, Esq.
      1900 Avenue of the Stars, 21st Floor
      Los Angeles, California 90067
      Tel:   (310) 553-3610
      Fax:   (310) 553-0687
      *Attorneys for Oscar De La Hoya*