UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
MILANA DRAVNEL,

              *Plaintiff,*

    – against –

OSCAR DE LA HOYA, and JOHN and/or JANE
DOES 1&2,

              *Defendants.*
----------------------------------------------------X

Case No.: 07-cv-10406

Hon. Laura T. Swain

## <u>DECLARATION OF JUDD BURSTEIN</u>

**JUDD BURSTEIN, ESQ.**, hereby declares under penalty of perjury:

1)     I am an attorney duly admitted to practice before the Bar of this Court.

2)     I represent Defendant Oscar de la Hoya ("Defendant") in this action.

3)     I submit this Declaration in support of Defendant's Motion to Compel Arbitration.

4)     The purpose of this Declaration is to authenticate certain documents referred to in the accompanying memorandum of law in support of the Motion to Compel Arbitration submitted on behalf of Defendant.

5)     Annexed hereto as Exhibit A is a true and accurate copy of Plaintiff Milana Dravnel's ("Plaintiff") original Complaint, dated November 14, 2007, filed in this action.

6)      Annexed hereto as Exhibit B is a true and accurate copy of an Agreement, executed September 23, 2007, entered into between Plaintiff and Defendant.

7)      Annexed hereto as Exhibit C is a true and accurate copy of Plaintiff's Amended Complaint, dated January 2, 2008, filed in this action.

8)      Annexed hereto as Exhibit D is a true and accurate copy of Plaintiff's memorandum of law in opposition to Defendant's Motion to Dismiss, dated January 23, 200[8], filed in this action.

9)      Annexed hereto as Exhibit E are true and accurate copies of Defendant's reply memorandum of law in further support of his Motion to Compel Arbitration, dated January 8, 2008, and Defendant's memorandum of law in support of his Motion to Dismiss the Amended Complaint, dated January 8, 2008, filed in this action.

10)     Annexed hereto as Exhibit F is a true and accurate copy of the Declaration of Stephen Espinoza, dated January 7, 2008, filed in this action in support of Defendant's original Motion to Compel Arbitration.

**WHEREFORE**, your Declarant prays for an Order granting Defendant's Motion to Compel Arbitration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 7th day of February, 2008, in New York, New York.

_____

JUDD BURSTEIN

2

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------X
MILANA DRAVNEL,

                              Plaintiff,

     -against -

OSCAR DE LA HOYA and John and/or Jane
Does 1 & 2,

                              Defendants.
-----------------------------------------------X

Index No.
Date Purchased: 07115321

SUMMONS

Plaintiff designates ~~NEW COUNTY~~ as the    *NEW YORK*
place of trial.
Venue is based on
residence of
Plaintiff.

TO THE ABOVE NAMED DEFENDANT(S):

     YOU ARE HEREBY SUMMONED to answer the Complaint in
this action and to serve a copy of your Answer within
twenty (20) days after the service of this Summons,
exclusive of the day of service [or within thirty (30) days
after the service is complete if this Summons is not
personally delivered to you within the State of New York];
and in case of your failure to appear or answer, judgment
will    be    taken    against    you    by    default
for the relief demanded in the Complaint.

Dated:    New York, New York
          November 14, 2007

                                   Yours etc.,

**FILED**

NOV 15 2007

NEW YORK
COUNTY CLERK'S OFFICE

                    BY:
                    SALVATORE STRAZZULLO, ESQ
                    STRAZZULLO LAW FIRM
                    Attorney for Plaintiff
                    100 Park Avenue
                    Suite 1600
                    New York, New York 10017
                    800-476-9993

PLAINTIFF'S ADDRESS:
1356 65th Street
Brooklyn, New York

DEFENDANT'S ADDRESS:
Oscar De La Hoya
713 N Star
Big Bear, CA 92315

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------X
MILANA DRAVNEL,

               Plaintiff,

        -against -

OSCAR DE LA HOYA and John and/or Jane
Does 1 & 2 ,

               Defendants.
--------------------------------------------X

Index No.

VERIFIED
COMPLAINT

07115321

    Plaintiff, by her attorneys, STRAZZULLO LAW FIRM, as
and for her complaint against the Defendants, alleges, upon
information and belief and at all times hereinafter
mentioned, as follows:

    1.    Plaintiff is a resident of the County of Kings,
State of New York.

    2.    Defendants John and/or Jane Doe are a
resident of the County of New York, State of New York.

    3.    Defendant OSCAR DE LA HOYA was and still is a
resident of the County of New York, State of New York

    4.    That on or about January 2006 through May 2007
Defendant OSCAR DE LA HOYA and Plaintiff had an intimate
relationship.

    5.    That on or about January 2006 through May 2007
Plaintiff had a personal relationship with Defendant Oscar
De La Hoya.

FILED

NOV 15 2007

COUNTY CLERKS OFFICE
NEW YORK

6. On or about May 17, 2007 there were photographs taken of the defendant, Oscar De La Hoya. The photographs were taken at the Ritz-Carlton in Philadelphia, State of Pennsylvania.

7. Plaintiff appeared on a live show on Entertainment Tonight to discuss the pictures and the events which took place between her self and defendant Oscar De La Hoya on or about May 2007.

8. On or about September 2007, the photographs that were taken by Plaintiff's camera are authentic as they were sold to x17online for publication below market value.

9. Subsequently thereafter and after meeting with defendant's Oscar De La Hoya's representatives, the Plaintiff was forced to recant what was stated at her previous interview with Entertainment Tonight regarding the photographs. Plaintiff contacted the Daily News newspaper while she was in a meeting with Mr. De La Hoya's representatives and his "spin" press who coached her in her statement to the Daily News.

10. Further the defendants claimed that there were FBI detectives who were interested in speaking with the Plaintiff regarding the interview and photographs.

11. That on or about September 23, 2007 Plaintiff entered into an agreement with Stephen Espinoza, as

authorized representative of Oscar De La Hoya (hereinafter referred to as the "Agreement".)

12. The agreement was one-sided and essentially written so Plaintiff would not enter "into any agreement with any third party regarding [defendant Oscar De La Hoya] or any photograph or image purporting to depict the defendant, other than x17."

13. Defendant Stephen Espinoza, who signed Defendant's Oscar De La Hoya's name as authorized representative and my friend were present during the execution of the agreement. Mr. De La Hoya was not present during the execution of the agreement

14. There was no consideration for entering into this agreement with the defendants.

15. There was no negotiation of said agreement. That Plaintiff was not represented by an attorney during the execution of the agreement. However, the only addition to the agreement that Plaintiff made was that it is subject to review by her review attorney.

16. There was no consideration for the Agreement with the Defendants.

### FIRST CAUSE OF ACTION - FRAUD

17. On or about September 2007 defendants represented to Plaintiff that Plaintiff will publicly recant and

retract her prior public statements regarding Oscar De La Hoya and not sell the photographs. Further, the representatives claimed that they would indemnify the Plaintiff and they would not file any lawsuits arising from the initial sale of the photographs. The agreement stated that if there was any breach of violation of the agreement that they would be entitled to liquidated damages.

18.    In the interim, the image of the Plaintiff was ruined as she was coerced to recant to the Daily News her prior truthful public statements. Plaintiff's image has been tarnished and was portrayed as a liar to the press.

19.    All of these representations were false and were made to induce Plaintiff to refrain from making any further public statements concerning the pictures taken of Oscar De La Hoya. The Plaintiff has not been able to speak for herself and reclaim her image. If she did, she would be in violation of the agreement. These false representations were made to enable, STEPHEN ESPINOZA, as authorized representative and Oscar De La Hoya to more easily diminish the Plaintiff's stature and destroy her reputation.

20.    At the times these representations were made, Defendants had no intention of fulfilling these promises, and knew them to be false.

21. Reassured by Plaintiff's one year personal relationship with Oscar De La Hoya, Plaintiff relied on the foregoing representations by, *inter alia*, not making public statements concerning the pictures that were taken by her and her interview with Entertainment Tonight or its aftermath in order to protect her reputation, foregoing other employment opportunities that would have been available to her from not signing the agreement.

22. As a direct and proximate result of the Defendants knowing representations, Plaintiff has suffered monetary damages, as well as harm to her public reputation

23. That Defendants conduct was willful and malicious.

24. As a direct and proximate result of defendants' fraud, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but not less than $20 million.

## SECOND CAUSE OF ACTION - TORTIOUS INTEFERENCE WITH CONTRACT

Plaintiff repeats, reiterates and re-alleges the allegations contained in paragraphs 1 through 24, supra, as if fully set forth here.

25. Plaintiff and Defendant had a personal relationship with defendant OSCAR DE LA HOYA from early 2006 through May 2007.

26.  By acts described herein, Defendants and through their agents intentionally procured the execution of said Agreement in an effort to stonewall the Plaintiff's effort to sell the pictures taken by her from her own camera.

27.  Defendants' conduct was willful and malicious.

28.  As a direct and proximate result of these defendants' tortuous interference with entering into an Agreement with Defendant, Defendant is entitled to compensatory damages in an amount to be determined at trial, but not less than $20 million, and punitive damages in an amount to be determined at trial, but not less than $50 million.

<u>THIRD CAUSE OF ACTION - UNDUE INFLUENCE</u>

Plaintiff repeats, reiterates and re-alleges the allegations contained in paragraphs 1 through 28, supra, as if fully set forth here.

29. Defendants had a confidential and/or fiduciary relationship with Plaintiff.  Plaintiff and Defendant were in an intimate relationship from January 2001.

30.  That Defendants' obtained Plaintiff's signature on said agreement by means of coercion.

31.  That the coercion Defendants exerted upon Plaintiff deprived Plaintiff of free will.

32.  That  the  influence  Defendant  exercised  over Plaintiff  amounted  to  a  moral  coercion,  which  restrained independent  action  and  destroyed  free  agency,  or  which,  by importunity  which  could  not  be  resisted  constrained  the Plaintiff  to  do  that  which  was  against  her  free  will  and desire,  but  which  she  was  unable  to  refuse.

33.  That  Plaintiff  was  in  a  mental  condition  such that  she  was  completely  dependent  upon  the  representations and  was  unaware  of  the  legal  consequences  of  the transaction.

34.  That  based  on  the  Doctrine  of  Constructive  Fraud — the  Defendants  have  the  burden  of  proving  by  clear  and satisfactory  evidence  that  entering  into  the  Agreement  was freely  and  voluntarily  made  and  that  Defendants  did  not acquire  the  Plaintiff's  signature  by  fraud,  undue influence,  or  coercion.

35.  That  based  on  the  doctrine  of  undue  influence, the  Court  should  grant  an  order  rescinding  the  Agreement and  granting  Plaintiff  damages  in  the  amount  of_ $20 million.

FOURTH CAUSE OF ACTION – DEFAMATION

Plaintiff  repeats,  reiterates  and  re-alleges  the allegations  contained  in  paragraphs  1  through  35,  supra,  as if  fully  set  forth  here.

36. Defendant's OSCAR DE LA HOYA subsequent statement to Entertainment Tonight is a broadcast which tends to expose Plaintiff to public hatred, contempt, ridicule or disgrace. Defendant in his interview stated that the pictures taken by Plaintiff with her own camera were photoshopped.

37. These statements are clearly defamatory and were purportedly disseminated to two prominent New York City publications, the New York Times and Entertainment Tonight.

38. These statements were clearly directed and there was no question that they pertained directly to Plaintiff.

39. These statements made by Defendants were false and had no basis and were made knowingly by defendant in reckless disregard of the truth.

40. Should these statements actually be published in all of the publications to which they were disseminated, Plaintiff stands to suffer a significant financial loss due to its damage to her goodwill and her reputation in the industry in an amount to be determined at trial.

FIFTH CAUSE OF ACTION - INFLICTION OF EMOTIONAL DISTRESS

Plaintiff repeats, reiterates and re-alleges the allegations contained in paragraphs 1 through 40, supra, as if fully set forth here.

41.   Defendant's conduct would be intolerable to any ordinary member of the community.

42.   Upon information and belief, defendant OSCAR DE LA HOYA, set up the meeting with his authorized representative and Plaintiff to scapegoat himself for conduct that he had done, it was well aware that such conduct would cause Plaintiff significant mental distress.

43.   As a result of this outrageous conduct, Plaintiff suffered severe emotional distress.

44.   Since the moment she was forced to recant her story with Daily News, Plaintiff as suffered from increased, severe levels of stress, anxiety and depression, She has been unable to work since the incident,

45.   As a result thereof, Plaintiff has suffered substantial loss, including general and special damages, in an amount to be proven at trial of not less than $20 million.

46.   Plaintiff is also entitled to punitive damages.

WHEREFORE, Plaintiff demands judgment against the Defendant for rescission of the Agreement;

   a. On the first cause of action against defendants Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but not less than $20 million;

b. On the second cause of action against defendants Plaintiff Defendant is entitled to compensatory damages in an amount to be determined at trial, but not less than $20 million, and punitive damages in an amount to be determined at trial, but not less than $50 million;

c. On the third cause of action doctrine of undue influence, the Court should grant an order rescinding the Agreement and granting Plaintiff damages in the amount of $20 million;

d. On the fourth cause of action in an amount to be determined at trial;

e. the fifth cause of action including general and special damages, in an amount to be proven at trial of not less than $20 million.

f. together with attorneys' fees, and for such other relief as the Court may deem just and proper.

Dated: Brooklyn, New York
     November 14, 2007

                  Yours, etc.,

                  BY:
                  SALVATORE STRAZZULLO, ESQ.
                  STRAZZULLO LAW FIRM
                  Attorneys for Plaintiff
                  100 Park Avenue
                  Suite 1600
                  New York, NY 10017
                  800-476-9993

## VERIFICATION

STATE OF NEW YORK   )
                     )    ss.:
COUNTY OF KINGS    )

The undersigned, the PLAINTIFF named in the foregoing action, being duly sworn, says:

I have read the foregoing VERIFIED COMPLAINT subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true.



               MILANA DRAVNEL

Sworn  to  before  me  this
14th day of November , 2007

      Notary Public

SALVATORE E. STRAZZULLO
Notary Public, State of New York
No. 02ST6124040
Qualified in Kings County
Commission Expires Jan. 12, 2008

# EXHIBIT B

## AGREEMENT

The following sets forth the terms of the agreement ("Agreement"), dated as of September 22, 2007, between Malina Dravnel ("MD") and Oscar De La Hoya ("DLH"). In consideration of the reciprocal commitments and mutual benefits hereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. MD acknowledges that she, on her own initiative, approached DLH's representatives and initiated the discussions which have resulted in this Agreement. MD acknowledges that the purpose for initiating contact with DLH's representative was to advise them of her intention to publicly recant and retract her prior public statements regarding DLH and to publicly announce that the images that had been previously posted to the internet had been taken from MD's camera by a third party without her consent and had been altered and to seek DLH's consent and approval of her public statement(s) (the "Statements"). MD acknowledges that she has not requested, nor has DLH agreed, to pay or to cause any other party to pay to her any financial compensation in connection with this Agreement or otherwise.

2. MD represents and warrants that she has not entered into any agreement with any third party regarding DLH, or any photograph or image purporting to depict DLH, other than X17. Pursuant to MD's request, but subject to MD actually publicly making the Statements as mutually agreed by MD and DLH, DLH: (a) shall indemnify MD against all legal fees paid or incurred by MD for the defense of any third party lawsuit, whether filed domestically and/or internationally, against MD at any time after the date hereof claiming that the Statements constitute a breach of an agreement between MD and a third party; and (b) agrees not to file or pursue any lawsuit against MD arising out of any publication of photographs or interviews given by MD which occurred prior to the date hereof. MD agrees not to file or pursue any lawsuit against DLH arising out of any matter which has occurred prior to the date hereof.

3. MD shall keep this Agreement and the terms hereof strictly confidential. Without limiting the generality of the foregoing, MD shall not use, divulge, disseminate, discuss, refer to or acknowledge the existence of, publish, reproduce or otherwise disclose (or authorize or permit any third party to do any of the above): (a) this Agreement or the terms hereof; (b) any information regarding DLH; or (c) any photographs or images of DLH. In addition, after the date hereof MD shall not, without DLH's prior written consent, grant or participate in any interviews or articles, make any public statement or otherwise discuss or divulge any information regarding DLH. In the event of any breach or violation by MD of the terms of this Paragraph 3, then DLH shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $25,000 for each violation hereof. Likewise in the event of any breach or violation by DLH of DLH's obligations pursuant to Paragraph 2, then MD shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $250,000 for each violation hereof. In addition, MD agrees that In the event of any breach, alleged breach or violation of the terms of this Paragraph 3, then DLH shall sustain irreparable damage and damage which is difficult, and DLH shall therefore be entitled to injunctive and/or other equitable remedy to prevent and/or remedy any such breach or violation, and MD agrees not to oppose any such injunctive or other equitable remedy.

4. Notwithstanding anything to the contrary contained herein, and without prejudice to any other remedies set forth herein or otherwise at law or in equity, DLH's obligations under Paragraph 2

shall be null and void, and DLH shall be fully released from all of his covenants and obligations thereunder, in the event of any breach, alleged breach or violation by MD of the terms of Paragraphs 2 or 3 above.

5.      This is the entire agreement between MD and DLH regarding the subject matter hereof. MD acknowledges that neither DLH nor any other party has made any promises to her other than those contained in this Agreement. This Agreement may not be amended or modified in any way, except pursuant to a written instrument signed by both parties. MD acknowledges that she has been advise to consult with an attorney before signing this Agreement and that she has had a reasonable opportunity to do so.

6.      Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any applicable law, rule or regulation, and if there shall exist any conflict between any provision of this Agreement and any such law, rule or regulation, the latter shall prevail and the pertinent provision or provisions of this Agreement shall be curtailed, limited or eliminated to the extent necessary to remove such conflict, and as so modified, this Agreement shall continue in full force and effect. In the event that one or more of the provisions of this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be in any way affected or impaired thereby.

7.      This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be fully performed therein. Any and all disputes, claims, controversies and actions hereunder shall be resolved by private, confidential arbitration in New York, NY pursuant to the rules of JAMS. Each party shall have a right of appeal to a three-arbitrator panel, which appeal shall also be conducted by private, confidential arbitration in accordance with the rules of JAMS.

MD ACKNOWLEDGES THAT SHE HAS CAREFULY READ THIS AGREEMENT, UNDERSTANDS IT, AND IS VOLUNTARILY ENTERING INTO IT OF HER OWN FREE WILL, WITHOUT DURESS OR COERCION, AFTER DUE CONSIDERATION OF ITS TERMS AND CONDITIONS. MD FURTHER ACKNOWLEDGES THAT EXCEPT AS STATED IN THIS AGREEMENT, NEITHER DLH NOR ANY REPRESENTATIVE OF DLH HAS MADE ANY OTHER REPRESENTATIONS OR PROMISES TO HER.

*SUBJECT TO FURTHER REVIEW BY MD'S ATTORNEY*

_____          _____
Milana Dravnel                            Oscar De La Hoya
                                          By Stephen Espinoza, Authorized Representative
Date:_____          Date:_____

AGREED AND ACCEPTED, AS TO THE CONFIDENTIALITY PROVISIONS OF PARAGRAPH 3 ONLY:

_____
Richard Rubino

-2-

EXHIBIT C

RECEIVED

JAN - 2008

JUDD BURSTEIN, PC

DOC: By hand
CAL:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MILANA DRAVNEL,

                                    Plaintiff,                           **AMENDED COMPLAINT and**
                                                                         **DEMAND FOR JURY TRIAL**
            -against-

OSCAR DE LA HOYA, and                                   Hon. Laura T. Swain
JOHN and/or JANE DOES 1 & 2,                            Case No.: 07-cv-10406

                                    Defendants.

-----------------------------------------------------------------X

        MILANA DRAVNEL, by her attorneys SALVATORE STRAZZULLO and

STRAZZULLO LAW FIRM, as and for her complaint against Defendants, based upon

personal knowledge with respect to herself and on information and belief with respect to

all other matters, alleges as follows:

### JURISDICTION and VENUE

1.      Plaintiff MILANA DRAVNEL (hereinafter "DRAVNEL") is a resident of the

        County of Kings, State of New York.

2.      Upon information and belief, the defendants reside in California.

3.      The amount of the controversy exceeds the sum of Seventy-Five Thousand

        Dollars.

4.      The transactions at issue in this Complaint occurred in the County of New

        York, State of New York, thus venue is within the Southern District of New

        York.

## THE PARTIES AND DEFENDANT DE LA HOYA'S AGENTS

5.      Plaintiff emigrated from Russia to the United States, is twenty-two years old, has just a high school education and is employed as a dancer and model.

6.      Defendant De La Hoya is a world famous boxer and champion, and a successful businessman.  He is the owner of Golden Boy Enterprises, which owns various publishing enterprises, and Golden Boy Promotions, a national boxing promotional firm.

7.      Stephen Espinoza is one of De La Hoya's attorneys, and at all times acted within the scope of his employment as attorney for De La Hoya.  Espinoza at all times acted as agent of Defendant De La Hoya.

8.      Jack Tiernan, Debbie Kaplan, and Glen Bunting are publicists employed by De La Hoya, and at all times acted within the scope of their employment as publicists for De La Hoya and as agents of Defendant De La Hoya.

9.      Upon information and belief, Raul Lnu is De La Hoya's boxing agent, and at all times acted within the scope of his employment as De La Hoya's agent, and acted in a principal-agent capacity.

## RELEVANT FACTS

10.     On or about the weekend of September 28, 2006, Defendant De La Hoya got together with Plaintiff in New York City.

11.     Over the next months, at various times, and in different locations, Plaintiff met De La Hoya, at his request.

2

12.    From September 2006 through May 2007, Plaintiff and De La Hoya engaged in a personal relationship, and spoke often via cell phones or text messaging.

13.    From their time together, it was apparent to Plaintiff that De La Hoya was a wealthy and powerful person.

14.    During the time Plaintiff and De La Hoya spent time together, Plaintiff told De La Hoya personal information about her family and circumstances. In particular, he knew Plaintiff and her family had emigrated from Russia, and that she was in the process of seeking her citizenship.

15.    During various times that the parties were together, photographs ("the photographs") were taken of De La Hoya with his knowledge, participation, and consent.

16.    On or about September 16, 2007, Plaintiff was approached to sell the photographs taken of De La Hoya.

17.    Thereafter, De La Hoya together with his agents, specifically Raul Lnu, Espinoza, and Bunting, and others, made efforts to place undue influence and pressure on Plaintiff to deny the authenticity of the photographs, and to prevent her from releasing the photographs to the public.

18.    Further, in the following days and weeks, De La Hoya, through Raul Lnu and others, began a campaign to locate, harass, intimidate and coerce Plaintiff.

19.    For instance, Plaintiff began receiving repeated cell phone calls from representatives of De La Hoya conducted in a frightening manner.

3

20.     In addition, Plaintiff learned from her former employer that someone was anonymously calling at her place of employment and trying to locate her.

21.     Plaintiff also received a call on her cell phone from someone who identified himself as a Spanish news reporter interested in purchasing photographs of De La Hoya – yet, to Plaintiff's knowledge, no one possessed that cell phone number of Plaintiff's other than De La Hoya.

22.     In addition, a friend of Plaintiff's, who was aware of the existence of the photographs, received a telephone call from a person who identified himself as an agent of the F.B.I., and asked where Plaintiff lived.  The caller was threatening, intimating that he was investigating a crime in which Plaintiff was involved and that Plaintiff would be arrested.

23.     Additionally, Raul Lnu, acting in the interests of De La Hoya, repeatedly questioned Plaintiff's friend about the kind of car Plaintiff drove and where she lived.

24.     As a result, Plaintiff was made aware that De La Hoya and his representatives were actively looking for her, seeking possession of the photographs by various means.

25.     On or about September 18, 2007, X17, an on-line celebrity news site, agreed and did purchase the photographs of Defendant De La Hoya from Plaintiff. Further, Plaintiff entered an agreement with X17 regarding the selling of

4

additional interviews to other media outlets, and a publicity schedule was created.

26. Plaintiff also entered into an agreement with R. Couri Hay Creative Public Relations, a world famous public relations firm that represents sports figures, models, and other famous people of interest.

27. As part of the agreements with X17 and R. Couri Hay Creative Public Relations, Plaintiff appeared and was interviewed on Entertainment Tonight, a celebrity news television channel, regarding the photographs, and portions of the interview were broadcast at various intervals that September week.

28. After Plaintiff's interview was aired on television, she and/or her representatives began receiving calls from other large entertainment media groups, which made expressed specific interest in interviewing Plaintiff regarding the photographs. For example, Playboy Magazine, Maximum Magazine, OK Magazine, and the Inquirer expressed interest in interviewing Plaintiff and purchasing the photographs.

29. R. Couri Hay Creative Public Relations was also working on book, movie and other sponsorship deals regarding the photographs on behalf of Plaintiff.

30. During this time, Defendant De La Hoya and his representatives threatened to interfere with her pending United States citizenship application in retribution, and to prevent further publication of the photographs.

31.   Defendant De La Hoya also publicly threatened legal action regarding the use of the photographs.

32.   Plaintiff became frightened, distraught, emotionally fragile, and unable to eat during this period of time.

33.   Fearing retaliation, Plaintiff agreed to meet representatives of Defendant De La Hoya's who indicated that they wanted to prevent further dissemination of the photographs.

34.   On or about September 23, 2007, De La Hoya's attorney, through his representatives Stephen Espinoza, an attorney, and Greg Bunting, a publicist, met Plaintiff at offices of Defendant's representatives in Manhattan. Plaintiff brought a friend to that meeting.

35.   During the meeting, Espinoza spoke with Defendant De La Hoya on the telephone numerous times. They discussed various versions of events and information that Plaintiff could disseminate to the media regarding the photographs.

36.   As a consequence of Espinoza's, Bunting's and De La Hoya's coercive tactics, Plaintiff felt compelled to announce through the media, falsely, that the photographs were fabricated, altered, and were not genuine depictions of people or events.

37.   Defendant De La Hoya, Espinoza and Bunting coerced Plaintiff to renounce the genuineness of the photographs even though Defendant knew that this was

a false statement, and that the photographs had not been altered and were genuine.

38.   In furtherance of their efforts to coerce Plaintiff to deny falsely the authenticity of the photographs, and thereby relinquish any rights and benefits she had in relation to the photographs, Espinoza, Bunting, and De La Hoya prepared a written statement for Plaintiff to read to the press.  The statement required Plaintiff to declare falsely that she could not verify the authenticity of the photographs and that she had been pressured into going public with the photographs by certain individuals who had improper motives.

39.   Espinoza and Bunting instructed Plaintiff that they would telephone the media, and she should read the false statement that they had prepared for her disavowing the authenticity of the photographs.

40.   Espinoza and Bunting contacted a Daily News reporter and supervised Plaintiff as she read the statement that they had prepared.

41.   As a result of the false statements Plaintiff was coerced into making, Plaintiff lost specific business opportunities and suffered monetary damages.

42.   Defendant De La Hoya, through his agents Espinoza and Bunting, had knowledge of these interview offers and business opportunities.

## FIRST CAUSE OF ACTION

### (Tortious Interference With Business Relations)

43.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by

reference.

44.    Various media entities sought to interview Plaintiff regarding the photographs,

for which Plaintiff would be compensated.

45.    However, once Defendant coerced Plaintiff to state, falsely and publicly, that

the she could not verify the authenticity of the photographs, those contracts

and business opportunities were voided by those media entities.

46.    Defendant maliciously, knowingly, and intentionally interfered with the

negotiations or prospective contracts of Plaintiff with third parties. Were it not

for Defendant's improper interference, Plaintiff would have had economic

opportunities from which she would have profited.

47.    Plaintiff suffered special and compensatory monetary damages from

Defendant's acts in the amount of five million dollars ($5,000,000).

## SECOND CAUSE OF ACTION

### (Tortious Interference with a Contract)

48.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by

reference.

49.   Plaintiff had a contract with X17 whereby X17 would sell the photographs to
      interested parties, and Plaintiff would receive proceeds from the sale of the
      photographs.

50.   That contract was rescinded as a direct result of Defendant and his agents
      coercing Plaintiff to represent, falsely, to X17, and other media outlets, that
      the photographs were not genuine depictions of people or events.

51.   Because of Defendant's and his agents' malicious, intentional, and improper
      interference with Plaintiff's contract with X17, she suffered special and
      compensatory monetary damages of five million dollars ($5,000,000).

### THIRD CAUSE OF ACTION

**(Intentional Infliction Of Emotional Distress)**

52.   Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by
      reference.

53.   Defendant and his agents deliberately conducted a campaign of harassment
      and intimidation against Plaintiff.

54.   Defendant's extreme and outrageous conduct in intimidating her and
      ultimately coercing her for their own purposes, was specifically intended to
      cause Plaintiff severe emotional distress, and did cause her extreme emotional
      distress.

9

55.     In turn, Plaintiff's extreme emotional distress caused by Defendant's and his agents' conduct prompted her to retract her previous, truthful assertions regarding the photographs, and to declare falsely that the photographs were not genuine depictions of people or events.

56.     As a result of Defendant's and his agents' conduct, Plaintiff has suffered extreme mental anguish, to her damage, in the amount of five-million dollars ($5,000,000).

## FOURTH CAUSE OF ACTION

### (Defamation)

57.     Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

58.     Defendant and his agents maliciously and willfully entered into a scheme to defame and injure Plaintiff in her good name and reputation.

59.     Defendant and his agents slandered Plaintiff by stating through the media that Plaintiff had released fake photographs of Defendant De La Hoya. Defendant and his agents stated those things about Plaintiff despite that they knew that said statements were untrue, causing injury to Plaintiff.

60.     Defendant and his agents slandered Plaintiff by stating through the media that she had published and disseminated the photographs when she knew those photographs were not genuine depictions of people or events. Defendant and

10

his agents stated those things about Plaintiff despite that they knew they were untrue, causing injury to her.

61.     In addition, Defendant and his agents coerced Plaintiff, by intimidating and threatening her through various means, to state through the media that she could not personally verify that the photographs were genuine depictions of people or events, despite that Defendant and his agents knew that this was not true. This too caused injury to the Plaintiff.

62.     Specifically Defendant and/or his agents, made the following statements, knowing them to be false:

(a)     On or about September 19, 2007, Defendant De La Hoya's agent Jack Tiernan issued a statement to the press that "They're [the photographs] completely manufactured. The pictures have been manipulated or manufactured, and the matter has been referred to his [De La Hoya's] attorney." Tiernan further stated to the press that he had spoken with De La Hoya about the photographs and that De La Hoya had "said as much." These statements were published by Radar online and other internet and press media.

(b)     On or about September 19, 2007, Defendant De La Hoya's representative, Debbie Caplan, stated to the press that the photographs were "photoshopped" and that "They're not real." This statement was published by the New York Daily News.

(c)     On or about September 19, 2007, Defendant De La Hoya's attorney, Bertram Fields, issued a statement to the press that "The photographs depicting Mr. De La Hoya's image that were posted online today by an obscure paparazzi website are fake. Many of the website's viewers identified the photos as a 'really bad photoshop job.' Unfortunately, with today's technology, anyone can make any photo seem like something other than it is." This statement was published by repeatedly by the media, including but not limited to www.towleroad.com, radaronline.com, OG Paper, tmz.com, and popcrunch.com.

(d)     On or about September 19, 2007, Defendant De La Hoya's attorney, Bertram Fields, released a statement to the media that "He [Oscar] assures me the photographs are phony. He has asked me to pursue his legal remedies." This statement was widely sent to the media by Defendant, and specifically published by the New York Daily News, the National Ledger, and Access Hollywood.

(e)     On or about September 19, 2007, Defendant De La Hoya's representatives stated to "Extra's" Mario Lopez, that the photographs were fake. This statement was repeated by the reporter on the internet and on the television.

(f)     On or about September 22, 2007, Defendants and/or their agents stated to the media that Plaintiff wanted to "publicly announce that the images that had been previously posted to the internet had been taken from [DRAVNEL'S] camera by a third party without her consent and had been altered. . .;" and compelled Plaintiff to make a false statement to a New York Daily News reporter, that "I cannot personally verify the authenticity of the images of Oscar De La Hoya that have been shown on television. These images were taken from my personal camera and were out of my control."

(g)     On or about September 25, 2007, Defendant De La Hoya stated to the press that "These pictures are obvious fabrications." This statement was published by the New York Post.

(h)     On or about September 27, 2007, Defendant De La Hoya stated to reporter Mark Steines from "Entertainment Tonight" that "these [photographs] are fake, these are Photoshopped." This information was republished on various internet publications.

(i)     On or about September 28, 2007, Defendant De La Hoya appeared on Entertainment Tonight and The Insider, national television shows, and stated the photographs were fake and photoshopped.

(j)     On or about September 26, 2007, Defendant De La Hoya, through his attorney, Bertram Fields, released a statement to the press stating, "The woman who purportedly took the photographs has stated publicly she cannot confirm that the images have been posted, published and broadcast are genuine. A well known and independent photograph forensic expert has stated his opinion that the photographs are fake,

which is what Oscar De La Hoya has been saying all along." This statement was published by various news outlets, including the National Ledger.

63.   Defendant's and his agents' defamatory statements injured Plaintiff's personal reputation and good name, to her damage, in the sum of $5,000,000.

## FIFTH CAUSE OF ACTION

### (Product Libel)

64.   Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

65.   Defendant and his agents maliciously and willfully entered into a scheme to defame and injure the value of the photographs, thus destroying Plaintiff's business opportunities.

66.   Defendant and his agents stated to the media that Plaintiff had published and disseminated the photographs when she knew those photographs were not genuine depictions of people or events.   Defendants stated those things about the photographs even though they knew the statements were untrue, causing injury to the value or marketability of those photographs.

67.   Defendant's and his agents' defamatory statements about the photographs injured the value of the photographs and injured Plaintiff's business opportunities, all to Plaintiff's damage, in the sum of $5,000,000.

13

## FIFTH CAUSE OF ACTION

### (Defamation By Compelled Self-publication)

68.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

69.    Defendant and his agents intentionally and maliciously sought to destroy Plaintiff's reputation and good-name and expose her to public contempt, ridicule and disgrace, and to charge that Plaintiff was a liar and dishonest person, when they, directly and indirectly, coerced her to state through the media, that she had lied about the authenticity of the photographs and the truthfulness of her prior public statements about the photographs.

70.    Defendant and his agents were aware that their actions would compel Plaintiff to renounce the authenticity of the photographs as well as her previous statements.

71.    Defendant's and his agents' compelled defamatory statements injured Plaintiff's personal reputation and good name, to her damage, in the sum of $5,000,000.

**WHEREFORE**, Plaintiff **MILANA DRAVNEL** demands judgment as follows:

(a)    on the First Cause of Action of Tortious Interference With Business Relations, Plaintiff is entitled to special and compensatory damages in an amount to be determined at trial, but not less than Five-Million

14

Dollars ($5,000,000) and punitive damages in an amount to be

determined at trial, but not less than five million dollars ($5,000,000);

(b)    on the Second Cause of Action of Tortious Interference with Contract,

Plaintiff is entitled to special and compensatory damages in an amount

to be determined at trial, but not less than Five-Million Dollars

($5,000,000) and punitive damages in an amount to be determined at

trial, but not less than five million dollars ($5,000,000);

(c)    on the Third Cause of Action of Intentional Infliction of Emotional

Distress, Plaintiff is entitled to compensatory damages in an amount to

be determined at trial, but not less than five-million dollars

($5,000,000);

(d)    on the Fourth Cause of Action of Defamation, Plaintiff is entitled to

special damages and compensatory damages in an amount to be

determined at trial, but not less than five million dollars ($5,000,000);

and punitive damages in an amount to be determined at trial, but not

less than five-million dollars ($5,000,000);

(e)    on the Fifth Cause of Action of Product Libel, Plaintiff is entitled to

special and compensatory damages in an amount to be determined at

trial, but not less than five-million dollars ($5,000,000).

### Jury Demand

Plaintiff demands a jury trial.

15

Dated:  New York, New York
         January 2, 2008

Yours, etc.
STRAZZULLO LAW FIRM

By: _____
Salvatore Strazzullo, Esq. (SS 7419)
100 Park Avenue, Suite 1600
New York, New York  10017
Tel:  (212) 551-3224
Fax:  (212) 926-5001
*Attorneys for Plaintiff Milana Dravnel*

TO:  Judd Burstein, Esq.
      Judd Burstein, P.C.
      1790 Broadway, Suite 1501
      New York, New York  10019
      Tel:     (212) 974-2400
      Fax:    (212) 974-2944

      -AND-

      Greenberg Glusker
      Bertram Fields, Esq.
      Jeffrey Spitz, Esq.
      1900 Avenue of the Stars, 21st Floor
      Los Angeles, California  90067
      Tel:     (310) 553-3610
      Fax:    (310) 553-0687
      *Attorneys for Oscar De La Hoya*

16

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MILANA DRAVNEL,

                     Plaintiff,

     -against-

OSCAR DE LA HOYA, and
JOHN and/or JANE DOES 1 & 2,

                   Defendants.

-----------------------------------------------------------X

Case No.: 07-cv-10406

Hon. Laura T. Swain

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT OSCAR DE LA HOYA'S MOTION TO DISMISS
## THE AMENDED COMPLAINT FOR FAILURE TO STATE A
## <u>CLAIM UPON WHICH RELIEF CAN BE GRANTED</u>

STRAZZULLO LAW FIRM
Salvatore E. Strazzullo, Esq.
(SS 7419)
100 Park Avenue, Suite 1600
New York, New York 10017
Tel: (212) 551-3224
Fax: (212) 926-5001
*Attorneys for Plaintiff Milana Dravnel*

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

POINT I

    ACCEPTED AS TRUE, PLAINTIFF'S ALLEGATIONS IN HER
    AMENDED COMPLAINT SUFFICIENTLY SET FORTH CAUSES
    OF ACTION FOR TORTIOUS INTERFERENCE WITH BUSINESS
    RELATIONS AND CONTRACT, DEFAMATION, PRODUCT LIBEL,
    DEFAMATION BY COMPELLED SELF-PUBLICATION AND
    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS . . . . . . . . . . . . . 3

POINT II

    DEFENDANT WRONGFULLY INTERFERED WITH
    PLAINTIFF'S BUSINESS RELATIONSHIPS BY MAKING
    MISREPRESENTATIONS TO THE PUBLIC, CAUSING
    PLAINTIFF TO LOSE NUMEROUS BUSINESS OPPORTUNITIES . . . . . . . . 4

    A.   PLAINTIFF HAS ALLEGED NUMEROUS BUSINESS
         RELATIONSHIPS WITH THIRD PARTIES WITH WHOM
         DEFENDANT WRONGFULLY INTERFERED . . . . . . . . . . . . . . . . . . . 4

    B.   DEFENDANT'S FRIVOLOUS THREATS OF A LAWSUIT AND
         ARREST, AND DEFAMATION, CONSTITUTE THE TORTIOUS
         WRONGFUL MEANS BY WHICH HE INTERFERED WITH
         PLAINTIFF'S BUSINESS RELATIONS . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.   *BUT FOR* DEFENDANT'S INTERFERENCE BY WRONGFUL
         MEANS, PLAINTIFF'S PROSPECTIVE BUSINESS RELATIONS
         WOULD HAVE COALESCED INTO ACTUAL CONTRACTS . . . . . . . . 9

POINT III

    BECAUSE DEFENDANT USED WRONGFUL MEANS TO INTERFERE
    WITH PLAINTIFF'S EXISTING CONTRACTS, PLAINTIFF HAS
    ALLEGED A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE
    WITH CONTRACTS EVEN IF THE CONTRACTS WERE TERMINABLE
    BY WILL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

POINT IV

    PLAINTIFF'S FOURTH CAUSE OF ACTION FOR
    DEFAMATION SHOULD NOT BE DISMISSED......................11

    A.   DEFENDANT'S STATEMENTS INJURED PLAINTIFF'S
        TRADE OR BUSINESS; THEREFORE, SPECIAL
        DAMAGES NEED NOT BE PLED...........................12

    B.   DEFENDANT'S STATEMENTS ACCUSE PLAINTIFF
        OF COMMITTING LARCENY BY FALSE   PRETENSES,
        WHICH IS LIBEL *PER SE*, AND SPECIAL DAMAGES NEED
        NOT BE PLED.......................................13

    C.   FURTHER, DEFENDANT'S DEFAMATORY
        STATEMENTS EXPOSE PLAINTIFF TO PUBLIC
        RIDICULE AND CONTEMPT, OBVIATING THE NEED
        TO PLEAD SPECIAL DAMAGES..........................13

    D.   EVEN SO, PLAINTIFF HAS SUFFICIENTLY PLED
        SPECIAL DAMAGES...................................14

POINT V

    PLAINTIFF'S STATEMENTS TO THE *DAILY NEWS* DO NOT
    EXEMPT DEFENDANT FROM HIS LIBELOUS ACTIONS.............15

POINT VI

    PLAINTIFF'S FIFTH CAUSE OF ACTION IS SUFFICIENT, AND
    SPECIAL DAMAGES NEED NOT BE PLED......................18

POINT VII

    PLAINTIFF HAS SUFFICIENTLY PLED INTENTIONAL
    INFLICTION OF EMOTIONAL DISTRESS IN THE THIRD
    CAUSE OF ACTION...................................18

CONCLUSION.............................................20

TABLE OF AUTHORITIES

*Baxter v. A.R. Baron & Co., Inc.,*
    No. 94 Civ. 3913,
    1996 WL 586338 (S.D.N.Y. Oct. 11, 1996) (Koetl, J.) . . . . . . . . . . . . . . . . . . . . . 3

*Ben-Oliel v. Press Pub. Co.,*
    251 N.Y. 250, 167 N.E. 432 (N.Y.1929) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cohen v. Koenig,*
    25 F.3d 1168 (2d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

*Doe v. American Broadcasting Cos.,*
    152 A.D.2d 482, 543 N.Y.S.2d 455) (1st Dept. 1989) . . . . . . . . . . . . . . . . . . . 19

*Drug Research Corp. v. Curtis Publishing Co.,*
    7 N.Y.2d 435, 199 N.Y.S.2d 33 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Elmore v. Shell Oil Co.,*
    733 F.Supp. 544 (E.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Goldman v. Belden,*
    754 F.2d 1059 (2d Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Grant v. Wallingford Bd. of Educ.,*
    69 F.3d 669, (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,*
    50 N.Y.2d 183, 428 N.Y.S.2d 628 (1980) . . . . . . . . . . . . . . . . . . . . . . . .6, 7, 10

*Hinsdale v. Orange County Publications,*
    17 N.Y.2d 284, 270 N.Y.S.2d 592 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Hubbell Inc. v. Pass & Seymour, Inc.,*
    883 F.Supp. 955 (S.D.N.Y.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Internet Law Library v. Southridge Capital Management,*
    223 F.Supp.2d 474 (S.D.N.Y. July 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . .3

*J. Crew Group v. Griffin,*
    No. 90 Civ. 2663,
    1990 WL 193918 (S.D.N.Y.  November 27, 1990) (Conboy, K.) . . . . . . . . . . .16

*Lora v. Greifinger,*
    No. 96 Civ. 0628,
    1997 WL 102473 (S.D.N.Y. February 27, 1997) (Koetl, J.G.) . . . . . . . . . . . . . .3

*Matherson v. Marchello,*
    100 A.D.2d 233,  473 N.Y.S.2d 998 (2d Dept. 1984) . . . . . . . . . . . . . . . . . .12, 13

*Mencher v. Chesley,*
    297 N.Y. 94, 75 N.E.2d 257 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mobile Data Shred, Inc. v. United Bank of Switzerland,*
    No. 99 Civ. 10315,
    2000 WL 351516 (S.D.N.Y. Apr. 5, 2000) (Scheindlin, S.) . . . . . . . . . . . . . . . . 5

*Nader v. General Motors Corp.,*
    25 N.Y.2d 560, 307 N.Y.S.2d 647 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Omni Food Sales v. Boan,*
    No. 06 Civ. 119
    2007 WL 2435163 (S.D.N.Y.  August 24, 2007) (Crotty, P.) . . . . . . . . . . . . . . 9

*People v. Arnold,*
    15 A.D.3d 783, 790 N.Y.S.2d 291 (3d Dept. 2005) . . . . . . . . . . . . . . . . . . . . . .13

*Reporters' Assn. of America v. Sun Printing & Publishing Assn.,*
    186 N.Y. 437 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Riley v. Dun & Bradstreet,*
    172 F.2d 303 (6th Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Ruder & Finn Inc. v. Seaboard Sur. Co.,*
    52 N.Y.2d 663, 439 N.Y.S.2d 858 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Schneidman Heating v. New York Plumbers' Specialties Co.,*
    238 A.D. 318, 264 N.Y.S.146 (1st Dept. 1933) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Squire Records, Inc. v. Vanguard Recording Soc., Inc.,*
    25 A.D.2d 190, 268 N.Y.S.2d 251 (1st Dept. 1966) . . . . . . . . . . . . . . . . . . . . . .14

*Tischmann v. ITT/Sheraton Corp.,*
    882 F.Supp. 1358 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Universal City Studios v. Nintendo Co., Ltd.,*
    797 F.2d 70 (2d Cir.1986) *cert. denied,* 479 U.S. 987, 107 S.Ct. 578 (1986). . . 7

*Van Lengen v. Parr,*
    136 A.D.2d 964, 525 N.Y.S.2d 100 (4th Dept. 1988) . . . . . . . . . . . . . . . . . . . . 12

*Van-Go Transp. Co. v. N.Y. City Bd. of Educ,*
    971 F.Supp. 90 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

*Vasarhelyi v. New School for Social Research,*
    230 A.D.2d 658, 646 N.Y.S.2d 795 (1st Dept. 1996) . . . . . . . . . . . . . . . . . . . . 19

*Weldy v. Piedmont Airlines,*
    No. Civ-88-628E
    1989 WL 158342 (Dec. 22, 1989 W.D.N.Y.) (Elfvin, E.),
    *rev'd on other grounds,* 985 F.2d 57 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . 16

*Wieder v. Chem. Bank,*
    202 A.D.2d 168, 608 N.Y.S.2d 195 (1st Dept. 1994) . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 9(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . 1, 3

Fed. R. Civ. P. § 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Penal Law § 155.05[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Prosser, Torts at p. 915 [4th ed.] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .18

Prosser & Keeton, Torts § 12, at 61 [5th ed.] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MILANA DRAVNEL,

                            Plaintiff,

      -against-

OSCAR DE LA HOYA, and
JOHN and/or JANE DOES 1 & 2,

                        Defendants.

-------------------------------------------------------X

Case No.: 07-cv-10406

Hon. Laura T. Swain

**ORAL ARGUMENT REQUESTED**

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT OSCAR DE LA HOYA'S MOTION TO DISMISS THE AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

      Plaintiff Milana Dravnel submits this Memorandum of Law in opposition to Defendant Oscar De La Hoya's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 9(g).

      Simply put, Plaintiff has more than adequately pled causes of action as set forth in her amended complaint filed January 2, 2008, for tortious interference with business relations and contract, defamation, product libel, defamation by compelled self-publication and intentional infliction of emotional distress.

## STATEMENT OF FACTS

The facts of this matter are fully set forth in Plaintiff's Amended Complaint (hereinafter referred to as "Am. Com.").

Briefly, Plaintiff is a 22-year old dancer and model who met Defendant Oscar De La Hoya, a world renowned boxing champion, in New York City. (Am. Com. ¶¶ 5, 6, & 10.) Plaintiff and Defendant commenced a relationship. (Am. Com. ¶ 12.) At various times while Defendant and Plaintiff were together, photographs were taken of Plaintiff and Defendant. (Am. Com. ¶ 15.)

In September 2007, through her agent X17 and publicist R. Couri Hay, Plaintiff sold to various media photographs of Defendant. (Am. Com. ¶¶ 25 - 27.) In response, Defendant began a campaign of harassment against Plaintiff in an attempt to locate her and dissuade her from releasing the photographs, and thereafter issued nationwide press releases and media statements that the photographs were fake. (Am. Com. ¶¶ 17 – 24, 30, 31, 62 (a) – (j)).

Defendant's tactics frightened and intimidated Plaintiff. He, through his agents, was then able to persuade her to state, falsely, to the *New York Daily News* on September 23, 2007, that she could not verify the authenticity of the photographs. (Am. Com. ¶¶ 32, 38 – 40.)

Thereafter, Plaintiff filed suit against Defendant in state court for, *inter alia,* defamation. Defendant removed the action to federal court and filed a motion to dismiss the complaint and to compel arbitration. Plaintiff filed opposition papers to Defendant's motion to compel arbitration and filed an amended complaint on January 2, 2008. Defendant moved

to dismiss Plaintiff's amended complaint, and Plaintiff now files this memorandum in

opposition to Defendant's motion to dismiss her amended complaint.

For the reasons set forth below, Plaintiff has more than adequately pled causes of

action for tortious interference with business relations and contract, defamation, product

libel, defamation by compelled self-publication, and intentional infliction of emotional

distress and Defendant's motion to dismiss the amended complaint must fail.

**POINT I**

**ACCEPTED AS TRUE, PLAINTIFF'S ALLEGATIONS IN HER AMENDED
COMPLAINT SUFFICIENTLY SET FORTH CAUSES OF ACTION FOR
TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND
CONTRACTS, DEFAMATION, PRODUCT LIBEL, DEFAMATION BY
COMPELLED SELF-PUBLICATION AND INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the allegations in the

complaint are accepted as true. *Cohen v. Koenig,* 25 F.3d 1168, 1171-72 (2d Cir.1994),

*Grant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir. 1995). All reasonable

inferences must be made in the Plaintiff's favor. *See Baxter v. A.R. Baron & Co., Inc.,* No.

94 Civ. 3913, 1996 WL 586338, at *2 (S.D.N.Y. Oct.11, 1996) (Koetl, J.) (*abrogated* on

other grounds recognized by *Internet Law Library v. Southridge Capital Management,* 223

F.Supp.2d 474 (S.D.N.Y. July 17, 2002)). The court's function on a motion to dismiss is "not

to weigh the evidence that might be presented at trial but merely to determine whether the

complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d

Cir.1985); *see also Lora v. Greifinger,* No. 96 Civ. 0628, 1997 WL 102473, at *3 (S.D.N.Y.

February 27, 1997) (Koetl, J.)

3

As argued below, Plaintiff has pled sufficient causes of action for tortious interference with business relations and contract, defamation, product libel, defamation by compelled self-publication, and intentional infliction of emotional distress, and Defendant's motion to dismiss should be denied.

## POINT II

### DEFENDANT WRONGFULLY INTERFERED WITH PLAINTIFF'S BUSINESS RELATIONSHIPS BY MAKING MISREPRESENTATIONS TO THE PUBLIC, CAUSING PLAINTIFF TO LOSE NUMEROUS BUSINESS OPPORTUNITIES

Defendant claims, wrongly, that Plaintiff's allegations of tortious interference with business relations must fail because Plaintiff (1) did not identify specific business relationships; (2) did not allege that "but for Defendant's conduct" her prospective business relations would have "coalesced"; and (3) did not allege that Defendant engaged in "wrongful means." As demonstrated below, Defendant is incorrect on all three counts.

**A.** **Plaintiff has alleged numerous business relationships with third parties with whom Defendant wrongfully interfered.**

In her amended complaint, Plaintiff identified specific business relationships with which Defendant's defamation interfered as follows:

- "X17, an on-line celebrity news site, agreed and did purchase the photographs of Defendant De La Hoya from Plaintiff. Further, Plaintiff entered into an agreement with X17 regarding the selling of additional interviews to other media outlets, and a publicity schedule was created." (Am. Com. ¶ 25.)

- "Plaintiff also entered into an agreement with R. Couri Hay Creative Public Relations, a world famous public relations firm that represents sports figures, models and other famous people of interest." (Am. Com. ¶ 26.)

- "As part of the agreements with X17 and R. Couri Hay Creative Public Relations, Plaintiff appeared and was interviewed on Entertainment Tonight, a celebrity news

4

television channel, regarding the photographs, and portions of the interview were broadcast at various intervals that September week." (Am. Com. ¶ 27.)

- "After Plaintiff's interview was aired on television, she and/or her representatives began receiving calls from other large entertainment media groups, which made expressed specific interest in interviewing Plaintiff regarding the photographs. For example, Playboy Magazine, Maximum Magazine, OK Magazine, and the Inquirer expressed interest in interviewing Plaintiff and purchasing the photographs." (Am. Com. ¶ 28.)

- "R. Couri Hay Creative Public Relations was also working on book, movie and other sponsorship deals regarding the photographs on behalf of Plaintiff." (Am. Com. ¶ 9.)

As Defendant stated in his memorandum, "proof of an **existing contract is not necessary**." To meet the requirements of validly drafting this cause of action, Plaintiff must only demonstrate interference with a specifically identified business relationship with a third party to support a claim of tortious interference with business relations. *See Mobile Data Shred, Inc. v. United Bank of Switzerland*, No. 99 Civ. 10315, 2000 WL 351516, at *7 (S.D.N.Y. Apr. 5, 2000) (Scheindlin, S.) (Emphasis added).

Plaintiff has done just what the caselaw requires. As alleged in paragraph 28 of Plaintiff's Amended Complaint, media outlets including Playboy, Maximum, OK and the Inquirer had all communicated with R. Couri Hay Creative Public Relations and/or X17 about doing an interview with Plaintiff and purchasing the photographs. Indeed, Plaintiff went beyond merely alleging impairment of her ability to attract new business – a concern of the court's in *Mobile Data Shred, Inc.. Id.* at *7 (Scheindlin, S.). Plaintiff identified specific businesses with which she and her agents were communicating regarding a business transaction, with which Defendant wrongfully interfered by claiming the photographs were not authentic and essentially calling Plaintiff a liar. Defendant then further wrongfully

5

interfered with Plaintiff's business relations by coercing her to state to the media that she could not verify the authenticity of the photographs. All of those acts by Defendant and his agents, wrongfully interfered with Plaintiff's business relations which she identified in her amended complaint.

**B.      Defendant's frivolous threats of a lawsuit and arrest, and defamation, constitute the tortious wrongful means by which he interfered with Plaintiff's business relations.**

When a Defendant utilizes "wrongful means" to interfere with a Plaintiff's business relations, he is liable for tortious interference with business relations. "Wrongful means" include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degree of economic pressure. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp,.* 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 632 - 633 (1980).

As set forth in her amended complaint, the Defendant here used "wrongful means" to interfere with her business relations when (1) he threatened to have Plaintiff arrested (Am. Com. ¶ 22*)*; (2) he threatened to sue Plaintiff and others who published the photographs (Am. Com. ¶ 31, 62(d)); (3) he placed undue influence on Plaintiff to state that she could not authenticate the photographs (Am. Com. ¶¶ 17 – 24, 30 – 33, 36 – 40); and (4) he defamed and libeled Plaintiff and the photographs by stating the photographs were fake and had been manufactured (Am. Com. ¶ 62).

While Defendant claims that he "had a right to seek relief in the Courts," he did not have the right to threaten to commence a **frivolous** lawsuit, aimed to harass, intimidate, and

6

interfere with Plaintiff's business relations.[1]  (*See Hubbell Inc. v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 963 (S.D.N.Y.1995) (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628 (1980)); *Universal City Studios v. Nintendo Co., Ltd.,* 797 F.2d 70, 75 (2d Cir.1986) (citing Restatement (Second) of Torts) *cert. denied,* 479 U.S. 987, 107 S.Ct. 578 (1986).

Defendant's threats to institute a lawsuit were frivolous as Defendant knew the photographs were authentic, and that he had no grounds to sue.  His purpose in making such threats was to interfere with Plaintiff's business relationships by scaring Plaintiff and others into not publishing the photographs, and by coercing Plaintiff to state that she could not verify the authenticity of the photographs.  By employing such wrongful means, Defendant interfered with Plaintiff's business relations.

Defendant and his agents engaged in misrepresentations and deceit – wrongful behavior – by asserting through the media that Plaintiff released fake photographs of Mr. De La Hoya dressed in women's clothing.   These injurious falsehoods spread by Defendant and his agents were wrongful and tortious, and satisfy the "wrongful interference" element of Plaintiff's tortious interference with business relations cause of action against Defendant. Defendant and his agents issued the following defamatory and false statements about Plaintiff and the photographs, painting Plaintiff as a deceitful liar.  See Am. Com. ¶ 62.

- (a) On or about September 19, 2007, Defendant De La Hoya's agent Jack Tiernan issued a statement to the press that "They're [the photographs] completely manufactured.  The pictures have been manipulated or manufactured, and the matter has been referred to his [De La Hoya's] attorney."  Tiernan further stated to the press that he had spoken with De La Hoya about the photographs and that

---

[1]     At this point, Plaintiff only must allege that Defendant's threatened lawsuit was meant to harass and would have been frivolous, which she has done.  At trial, Plaintiff will then prove that Defendant knew the photographs were authentic; therefore, he had no grounds to sue.

De La Hoya had "said as much." These statements were published by Radar online and other internet and press media.

- (b) On or about September 19, 2007, Defendant De La Hoya's representative, Debbie Caplan, stated to the press that the photographs were "photoshopped" and that "They're not real." This statement was published by the New York Daily News.

- (c) On or about September 19, 2007, Defendant De La Hoya's attorney, Bertram Fields, issued a statement to the press that "The photographs depicting Mr. De La Hoya's image that were posted online today by an obscure paparazzi website are fake. Many of the website's viewers identified the photos as a 'really bad photoshop job.' Unfortunately, with today's technology, anyone can make any photo seem like something other than it is." This statement was published by repeatedly by the media, including but not limited to www.towleroad.com, radaronline.com, OG Paper, tmz.com, and popcrunch.com.

- (d) On or about September 19, 2007, Defendant De La Hoya's attorney, Bertram Fields, released a statement to the media that "He [Oscar] assures me the photographs are phony. He has asked me to pursue his legal remedies." This statement was widely sent to the media by Defendant, and specifically published by the New York Daily News, the National Ledger, and Access Hollywood.

- (e) On or about September 19, 2007, Defendant De La Hoya's representatives stated to "Extra's" Mario Lopez, that the photographs were fake. This statement was repeated by the reporter on the internet and on the television.

- (f) On or about September 22, 2007, Defendants and/or their agents stated to the media that Plaintiff wanted to "publicly announce that the images that had been previously posted to the internet had been taken from [DRAVNEL'S] camera by a third party without her consent and had been altered. . .;" and compelled Plaintiff to make a false statement to a New York Daily News reporter, that "I cannot personally verify the authenticity of the images of Oscar De La Hoya that have been shown on television. These images were taken from my personal camera and were out of my control."

- (g) On or about September 25, 2007, Defendant De La Hoya stated to the press that "These pictures are obvious fabrications." This statement  was published by the New York Post.

- (h) On or about September 27, 2007, Defendant De La Hoya stated to reporter Mark Steines from "Entertainment Tonight" that "these [photographs] are fake, these are Photoshopped." This information was republished on various internet publications.

8

- (i) On or about September 28, 2007, Defendant De La Hoya appeared on Entertainment Tonight and The Insider, national television shows, and stated the photographs were fake and photoshopped.

- (j) On or about September 26, 2007, Defendant De La Hoya, through his attorney, Bertram Fields, released a statement to the press stating, "The woman who purportedly took the photographs has stated publicly she cannot confirm that the images have been posted, published and broadcast are genuine. A well known and independent photograph forensic expert has stated his opinion that the photographs are fake, which is what Oscar De La Hoya has been saying all along." This statement was published by various news outlets, including the National Ledger.

**C.**     ***But for* Defendant's interference by wrongful means, Plaintiff's prospective business relations would have coalesced into actual contracts.**

Defendant's claim that Plaintiff failed to plead the "but for" element of her tortious interference claim is specious. The case of *Omni Food Sales v. Boan,* No. 06 Civ. 3913, 2007 WL 2435163 (S.D.N.Y. August 24, 2007) (Crotty, P.) is worthy of note. There the court found that Defendant's argument was specious in light of the fact that Plaintiff had properly pled the "but for" element of her cause of action by stating "as a result of [Defendant's] conspiracy, [the third party] rejected [Plaintiff] as its actual and potential broker." *Id.*

This case is no different. Plaintiff specifically pled in paragraph 46 of her Amended Complaint as follows:

> Were it not for Defendant's improper interference, Plaintiff would have had economic opportunites from which she would have profited.

At this point, Plaintiff has stated all of the elements of a cause of action for tortious interference with business relations. Certainly, no court requires Plaintiff to state a cause of action <u>and</u> also prove it in order to sustain a motion to dismiss. Moreover, Plaintiff is confident that at trial she will prove that Defendant defamed and libeled her by calling the

photographs fake and accusing her of releasing photoshopped and manufactured photographs; that he wrongfully threatened to sue her and others, coercing her into stating that she could not authenticate the photographs; and that *but for* Defendant's wrongful interference, Plaintiff would have entered into business contracts with Playboy, Maximum, OK and the Inquirer, and many other magazines.

### POINT III

**BECAUSE DEFENDANT USED WRONGFUL MEANS TO INTERFERE WITH PLAINTIFF'S EXISTING CONTRACTS, PLAINTIFF HAS ALLEGED A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACTS EVEN IF THE CONTRACTS WERE TERMINABLE BY WILL**

Whether the contracts interfered with were terminable at will or not, plaintiff still has a cause of action for tortious interference with contract. *See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 194, 428 N.Y.S.2d 628, 634 (1980) (stating that where contracts terminable at will have been involved, courts have upheld complaints and recoveries in actions seeking damages for interference when the alleged means employed by the one interfering were wrongful – including making fraudulent representations or threats. If such misconduct exists, a cause of action will lie where one's actions have induced nonperformance of a contract deemed to be voidable.) (Citations omitted)).

Plaintiff has sufficiently set forth a set of facts, which if accepted as true, comprises a cause of action for tortious interference with contract as follows: (1) the existence of valid contracts with X17 and R. Couri Hay (Am. Com. ¶¶ 25, 26 & 49); (2) that defendant was aware of the contracts (Am. Com. ¶¶ 31 & 42); (3) defendant intentionally and wrongfully interfered with the contracts by making fraudulent representations about the photographs, threatening lawsuits and publicly defaming plaintiff and the photographs (Am. Com. ¶¶ 58 – 62); and (4) caused damages to plaintiff (Am. Com. ¶¶ 51, 63, 67, & 71.)

Defendant's argument that there is no evidence that defendant did or said anything to interfere with plaintiff's contracts with X17, a celebrity news site, and R. Couri Hay Creative Public Relations, a world famous public relations firm (Am. Com. ¶¶ 25 &26), defies logic. X17 and R. Couri Hay are in the business of media and public relations. Of course, they were aware of defendant's widespread statements to the press that the photographs were fake (Am. Com. ¶ 62 (a) – (j)) and his threats of legal action (Am. Com. ¶ 62(d)).

Lastly, defendant's parsing of the word "rescinded" should not bar plaintiff from pursing her cause of action for tortious interference. Defendant claims, that by only alleging that X17 rescinded the contract, Plaintiff has not pled that X17 breached the agreement. There is no evidence that X17's rescinding of the contract was not a breach of the contract. Rather, that is simply an assumption made by Defendant.

## POINT IV

## PLAINTIFF'S FOURTH CAUSE OF ACTION FOR DEFAMATION SHOULD NOT BE DISMISSED[2]

Defendant wrongfully alleges that Plaintiff did not sufficiently plead a defamation claim because (1) Defendant's defamation was not "slander *per se*" and Plaintiff did not allege special damages; (2) Plaintiff's statement that she could not authenticate the photos vitiated any liability that Defendant has for his defamatory publications; and (3) Defendant's statements made after Plaintiff was coerced into stating that she could not authenticate the photographs were not against Plaintiff.

---

[2]    In his memo of law, Defendant inadvertently labeled Plaintiff's defamation claim as her "third claim." Plaintiff's defamation claim is contained in her Fourth Cause of Action in the Amended Complaint.

Defendant's defamation is libel[3] *per se*, and special damages need not be pled or proved. *Van Lengen v. Parr,* 136 A.D.2d 964, 525 N.Y.S.2d 100 (4th Dept. 1988). Defendant committed libel *per se* by (1) accusing Plaintiff of committing a crime; (2) exposing Plaintiff to hatred and contempt and induced an evil or unsavory opinion of her in the minds of a substantial number of persons in her community (*Mencher v. Chesley,* 297 N.Y. 94, 100, 75 N.E.2d 257, 259 (1947); and (3) disparaging Plaintiff in her trade (*Ben-Oliel v. Press Pub. Co.* 251 N.Y. 250, 167 N.E. 432 (N.Y.1929)).

A.    **Defendant's statements injured Plaintiff's trade or business; therefore, special damages need not be pled.**

Defendant and his agents issued public statements that the photographs Plaintiff released were "fake", "manufactured", and "photoshopped," and injured Plaintiff in her trade or business – that is, the selling of the photographs.[4] Therefore, Defendant committed libel *per se* against Plaintiff when he impugned Plaintiff's business – the selling of the photographs – and she need not plead special damages.

---

[3]    Defamation broadcast by means of radio or television is classified as libel. *See Matherson v. Marchello,* 100 A.D.2d 233, 240, 473 N.Y.S.2d 998, 1004 (2d Dept. 1984). Given the vast and far-flung audiences reached by the broadcasting media today, it is self-evident that the potential harm to a defamed person is far greater when published via broadcast media, including the internet, rather than by simple spoken slander. As such, Defendant's press releases and nationwide media campaign defaming Plaintiff is libel.

[4]    As conceded by Defendant in his Memorandum of Law in Support of Motion to Compel Arbitration, dated November 26, 2007, at 4–5, Plaintiff's selling the photographs and engaging in media interviews involved "commerce." Plaintiff's reference to this point should not be construed in any way to mean that the September 23, 2007 document is a formed contract or that the arbitration clause included in the September 23, 2007 document is enforceable. It is only meant to demonstrate to the Court that Defendant agrees that Plaintiff's selling of the photographs and engaging in media interviews constitutes a "trade" or "business" with which Defendant tortiously interfered.

12

**B.**   **Defendant's statements accuse Plaintiff of committing larceny by false pretenses, which is libel *per se*, and special damages need not be pled.**

Additionally, Defendant further committed libel *per se* against Plaintiff by accusing Plaintiff of the crime of larceny by false pretenses.[5]  Defendant's claims that the photographs Plaintiff sold were fake, manufactured and photoshopped accused Plaintiff of intentionally presenting false information in exchange for the money of others.[6]  Therefore, Defendant's statements accusing Plaintiff of a crime are libel *per se*, and special damages need not be pled.

**C.**   **Further, Defendant's defamatory statements expose Plaintiff to public ridicule and contempt, obviating the need to plead special damages.**

Plaintiff suing in libel need not plead or prove special damages if the defamatory statement "tends to expose the Plaintiff to public contempt, ridicule, aversion or disgrace or induce an evil opinion of him [her] in the minds of right-thinking persons, and to deprive him [her] of their friendly intercourse in society (citations omitted)." *Matherson v. Marchello*, 100 A.D.2d 233, 236 – 237, 473 N.Y.S.2d 998, 1001 – 1002 (2d Dept. 1984).

Defendant, a world-famous boxer beloved by the community, portrayed Plaintiff as a "stripper" in the media, accused her of releasing "fake", "manufactured" and "photoshopped" photographs of Defendant.  These defamatory and untrue statements exposed Plaintiff to

---

[5]     A Defendant commits larceny by false pretenses when he or she "obtain[s] possession of money of another by means of an intentional false material statement about a past or presently existing fact upon which the victim relied in parting with the money" *People v. Arnold*, 15 A.D.3d 783, 786, 790 N.Y.S.2d 291, 294 (3d Dept. 2005) (citations omitted); Penal Law § 155.05[1].

[6]     That Defendant did not specifically accuse Plaintiff of "larceny by false pretenses" in his public statements, is of no merit.  In light of all the circumstances as pled in the complaint, it is clear that Plaintiff accused Plaintiff of committing a crime.  *See Hinsdale v. Orange County Publications*, 17 N.Y.2d 284, 270 N.Y.S.2d 592 (1966) (a publication may be libelous *per se* even where the writing is defamatory only in the light of extrinsic facts alleged in the complaint which are not part of the published matter.)

public ridicule and contempt from the general public. This public contempt is borne out by the remarks to the press by Defendant's attorney, Bertram Fields, when he reported "[m]any of the website's viewers identified the photos as a 'really bad photoshop job.'" (Am. Com. §62(c)).

Defendant's defamatory statements exposed Plaintiff to public ridicule and contempt, which will be borne out at trial. General damages are presumed, and Plaintiff need not plead special damages.

**D.    Even so, Plaintiff has sufficiently pled special damages.**

Despite that Plaintiff was not required to plead special damages, she has done so. Plaintiff specifically named the customers to whom she and her agents would have sold the photographs but for Defendant's defamation and wrongful interference, which is all that is required under case law.[7] *See Drug Research Corp. v. Curtis Publishing Co.,* 7 N.Y.2d 435, 441, 199 N.Y.S.2d 33, 37 (1960), *referring to Reporters' Assn. of America v. Sun Printing & Publishing Assn.,* 186 N.Y. 437, 422 (1906) (If special damage was a loss of customers, the persons who ceased to be customers, or who refused to purchase, must be named.)

Plaintiff need not show more at this pleading stage to meet the requirements of alleging special damages. *See Squire Records, Inc. v. Vanguard Recording Soc., Inc.,* 25 A.D.2d 190, 192, 268 N.Y.S.2d 251, 255 (1st Dept. 1966) (Plaintiff sufficiently alleged special damages by naming customers who no longer purchased his product); *Schneidman Heating v. New York Plumbers' Specialties Co.,* 238 A.D. 318, 319, 264 N.Y.S.146, 148 (1st

---

[7]    In her amended complaint, Plaintiff specifically named the customers (Playboy, Maximum, OK, and the Inquirer) who then did not purchase Plaintiff's photographs or interview her due to Defendant's wrongful acts of defamation and coercion (including the Defendant's coercive acts that resulted in Plaintiff stating to the *Daily News* on September 23, 2007 that she could not verify the authenticity of the photographs).

Dept. 1933) (special damages were sufficiently pled by naming the customers who were about to contract with it for work when a false letter was sent out by Defendant to the customers, which prevented Plaintiff from securing the contracts that otherwise would have been awarded to it.)

It is not necessary at this juncture to identify specific dollar figures, as long as the specific *customers* are named that will allow Defendant to identify the losses he is accused of causing. *See Riley v. Dun & Bradstreet*, 172 F.2d 303, 306 (6th Cir. 1949) (holding Plaintiffs properly pled special damages where Plaintiffs stated that they were unable to state with complete particularity all the contracts lost by reason of the dissemination of the false and libelous matter but listed the various contracts lost).

However, should the Court determine that Plaintiff needs to state specific dollar figures in connection with the customers named, she requests leave to amend the complaint to include such figures, as permitted by Fed. R. Civ. P. § 15(a).

### POINT V

### PLAINTIFF'S STATEMENTS TO THE *DAILY NEWS* DO NOT EXEMPT DEFENDANT FROM HIS LIBELOUS ACTIONS

Defendant remains liable for the consequences of his defamatory statements before and after he wrongfully caused Plaintiff to state to the *Daily News* that she could not personally verify the authenticity of the photographs.

Plaintiff concedes that New York law is unclear on the status of "compelled self-publication." *Compare Van-Go Transp. Co. v. N.Y. City Bd. of Educ*, 971 F.Supp. 90 (E.D.N.Y. 1997) (concluding largely on the basis of federal district courts' interpretation of New York law, that New York would recognize self-compelled publication), with

*Tischmann v. ITT/Sheraton Corp.,* 882 F.Supp. 1358 (S.D.N.Y. 1995) (N.Y. law) (citing

*Wieder v. Chem. Bank,* 202 A.D.2d 168, 608 N.Y.S.2d 195, 196 (1st Dept. 1994.)   The

Eastern and Western Districts have recognized the doctrine of self-compelled publication.

*See Elmore v. Shell Oil Co.,* 733 F.Supp. 544, 546 (E.D.N.Y. 1988); *Weldy v. Piedmont*

*Airlines,* No. Civ. 88628, 1989 WL 158342 (December 22, 1989) (Elfvin, E.), *rev'd on other*

*grounds,* 985 F.2d 57 (2d Cir. 1993). The Southern District has considered the question, but

has not arrived at a consensus. *Van-Go* at 103 – 104.

     Most of the cases dealing with the issue of "self-publication" are employment cases

wherein the employee claims that he or she was compelled to repeat the employer's

defamatory statement to future employers. (*Van-Go* and *Wieder* deal with self-compelled

publication in terms of an employment case.  The *Tischmann* case is silent as to whether the

self-compelled publication claim related to an employment matter, but it is very likely as the

case arose out of an employment sexual harassment matter.)  The defamatory statements

made by the employer are typically only made to the employee.  None of the cases reviewed

by Plaintiff or the courts regarding this issue have dealt with a situation wherein a Plaintiff

published the defamatory statement as a result of the Defendant's tortious, wrongful conduct.

     In reviewing the relevant New York federal and state cases, the courts look to the

foreseeability or likelihood that the Plaintiff would be required to repeat the Defendant's

defamatory statement.  The more likely it is that the Defendant could foresee that Plaintiff

would be compelled to repeat the statement, the more likely it is that the courts find in favor

of the principle of self-compelled publication. *J. Crew Group v. Griffin,* No. 90 Civ. 2663,

1990 WL 193918, * 3 - 5 (S.D.N.Y. November 27, 1990) (Conboy, K.), *Van-Go Transport*

*Co., Inc. v. New York City Bd. of Educ.,* 971 F.Supp. 90, 104 (E.D.N.Y. 1997).  In any event,

this is a factual issue, that must be resolved at trial.

Certainly, if the publication by Plaintiff is not voluntary or consensual, but is made as the result of duress, undue influence or other wrongful means, Defendant should not be permitted to escape liability for the harm he caused.

Central to the question is (1) did the Plaintiff voluntarily publish the defamatory statement; and (2) how foreseeable was it that the Plaintiff would have to republish the statement.

As stated by Judge Conboy in *Van-Go:*

> In reviewing these [compelled self-publication] cases, two trends seem apparent. When actually required to decide, most federal district courts hold that New York would adopt the doctrine of self-publication. Further, they largely agree that the *Weldy* formulation is the proper one, and that properly understood it requires a Plaintiff to show both foreseeability and compulsion. (Citations omitted.)

*Van-Go Transport Co., Inc.* at 104.

Since it was Defendant's own coercion that resulted in Plaintiff's statement that she could not verify the authenticity of the photographs, it was not only likely that Plaintiff would make such a statement, but it was foreseeable. Defendant knew that his coercion would result in compelling Plaintiff to publish a defamatory statement against herself. Plaintiff's statement to the *Daily News* was not voluntary and was completely foreseeable as Defendant caused it. Therefore, Plaintiff's statement to the *Daily News* cannot absolve Defendant of his liability for the harm caused by his defamatory statements.

For the same reasons, Defendant's defamatory statements after September 23, 2007 are no less defamatory than the ones he made prior to September 23, 2007.

## POINT VI

### PLAINTIFF'S FIFTH CAUSE OF ACTION IS SUFFICIENT, AND SPECIAL DAMAGES NEED NOT BE PLED

Plaintiff has sufficiently pled trade libel *per se*, which does not require the articulation of special damages. *See Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670 – 671, 439 N.Y.S.2d 858 (1981). Where a statement impugns the basic integrity or credit-worthiness of a business,[8] an action for defamation lies and injury is conclusively presumed.

Defendant and his agents defamed and libeled the integrity and credit-worthiness of the photographs that comprised Plaintiff's business by stating the photographs Plaintiff sold were "fake", "manufactured" and "photoshopped." These aspersions affected the legitimacy and quality of the photographs, to the disparagement of the quality of Plaintiff's business or product. *See* Prosser, Torts [4th ed], p 915 *et seq*. Therefore, a claim of product libel *per se* lies, and special damages need not be pled.

Further, as argued in POINT IV, *supra*, even if Plaintiff is required to plead special damages, she has adequately done so.

## POINT VII

### PLAINTIFF HAS SUFFICIENTLY PLED INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN THE THIRD CAUSE OF ACTION

Contrary to Defendant's contention, Plaintiff has sufficiently pled that Defendant's actions and those of his agents were extreme in degree, causing Plaintiff mental and emotional distress. "Where severe mental pain or anguish is inflicted through a *deliberate and malicious campaign of harassment or intimidation*, a remedy is available in the form of

---

[8]    As demonstrated in Footnote 4, Defendant has conceded that Plaintiff's selling the photographs and engaging in media interviews constitutes "commerce."

18

an action for the intentional infliction of emotional distress." (Emphasis added.)  *See Nader v. General Motors Corp.*, 25 N.Y.2d 560, 569, 307 N.Y.S.2d 647 (1970); *Doe v. American Broadcasting Cos.*, 152 A.D.2d 482, 483, 543 N.Y.S.2d 455) (1st Dept. 1989).

Plaintiff has sufficiently pled that Defendant and his agents engaged in a campaign to locate, harass, intimidate and coerce Plaintiff (*see* Am. Com. §§ 18, 53) with repeated cell phone calls that frightened her (Am. Com. § 19); calls to her former place of employment trying to locate Plaintiff (Am. Com. § 19); feigned calls from the F.B.I. attempting to locate Plaintiff, and threatening that Plaintiff was involved in a crime he was investigating, and threatening the arrest of Plaintiff (Am. Com. § 22); threats to interfere with Plaintiff's citizenship application (Am. Com. § 30); and threats of legal action by Defendant, a world-famous and powerful person (Am. Com. § 31).

The extreme and outrageous nature of Defendant's conduct arises not only from what he and his agents did in harassing, tracking and intimidating Plaintiff, but also from the relative ability of Defendant to damage Plaintiff. The more power Defendant has in relation to Plaintiff, the more power he has to cause harm to Plaintiff and her interests, increasing the emotional distress caused by his actions. *See Vasarhelyi v. New School for Social Research*, 230 A.D.2d 658, 661, 646 N.Y.S.2d 795, 797 (1st Dept. 1996) *referring to* Prosser & Keeton, Torts § 12, at 61 [5th ed.] (the extreme and outrageous nature of the conduct may arise not so much from the results of Defendant's abuse as from *the relation or position* which gives the Defendant actual or apparent power to damage the Plaintiff's interests.)

As pled by Plaintiff, there is a stark contrast between Defendant's position as a world famous boxer and champion, and a successful business man with national interests (Am. Com. § 6), and her own as a 22-year old dancer and model with a high school education

19

(Am. Com. § 5). His campaign of harassment was thus even more severe due to the extreme

power imbalance between the parties.

Plaintiff has more than adequately pled facts, which if proven, comprise the tort of

intentional inflection of emotional distress.

**CONCLUSION**

Accepting all of Plaintiff's assertions as true, Plaintiff has sufficiently pled causes of

action for tortious interference with business relations, defamation, product libel, defamation

by compelled self-publication and intentional infliction of emotional distress, and

Defendant's motion to dismiss the amended complaint must be denied.

Dated:       New York, New York
             January 23, 2007

                                          Yours, etc.

                                          STRAZZULLO LAW FIRM

                                          By:
                                          Salvatore F. Strazzullo, Esq.
                                          (SS 7419)
                                          100 Park Avenue, Suite 1600
                                          New York, New York 10017
                                          Tel: (212) 551-3224
                                          Fax: (212) 926-5001
                                          *Attorneys for Plaintiff Milana Dravnel*

TO:      Judd Burstein, Esq.
         Judd Burstein, P.C.
         1790 Broadway, Suite 1501
         New York, New York 10019
         Tel:    (212) 974-2400
         Fax:    (212) 974-2944
         -AND-
         Greenberg Glusker
         Bert Fields, Esq.
         Jeffrey Spitz, Esq.
         1900 Avenue of the Stars, 21st Floor
         Los Angeles, California 90067
         Tel:    (310) 553-3610

Fax:    (310) 553-0687
*Attorneys for Oscar De La Hoya*

EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MILANA DRAVNEL,

              *Plaintiff,*

   – against –

OSCAR DE LA HOYA, and JOHN and/or JANE
DOES 1 & 2,

              *Defendants.*
-------------------------------------------------------------X

Case No.: 07-cv-10406

Hon. Laura T. Swain

**ORAL ARGUMENT
REQUESTED**     

**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF DEFENDANT OSCAR DE LA HOYA'S
MOTION TO COMPEL ARBITRATION**

GREENBURG GLUSKER
1900 Avenue of the Stars
Los Angeles, California 90067
(310) 201-7484

- AND -

JUDD BURSTEIN, P.C.
1790 Broadway, Suite 1501
New York, New York 10019
(212) 974-2400

*Attorneys for Defendant
Oscar De La Hoya*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       PLAINTIFF'S MOTION TO COMPEL SHOULD BE GRANTED . . . . . . . . . . . . . . . . 3

     A.    THE ISSUE OF WHETHER THE SUPPOSED ABSENCE OF
          ATTORNEY APPROVAL VITIATES THE SEPTEMBER 2007
          AGREEMENT'S ARBITRATION CLAUSE MUST BE
          DECIDED BY THE ARBITRATOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.    PLAINTIFF'S CLAIM THAT THE SEPTEMBER 2007 AGREEMENT
          IS UNCONSCIONABLE MUST ALSO BE RESOLVED
          BY THE ARBITRATOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

## TABLE OF AUTHORITIES

CASES

*Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran,*
    445 F.3d 121 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bar-Aval v. Time Warner Cable Inc.,*
    2006 WL 2990032 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Baron v. Rabinovic,*
    2006 WL 1318426 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Brennan v. Bally Total Fitness,*
    198 F.Supp.2d 377 (S.D.N.Y. 2002) (Scheindlin, D.J.) . . . . . . . . . . . . . . . . . . . . . 9

*Brennan v. Bally Total Fitness,*
    153 F.Supp. 2d. 408 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Buckeye Check Cashing, Inc. v. Cardegna,*
    126 S.Ct. 1204 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cohn v. Geon Intercontinental Corp.,*
    62 A.D.2d 1161, 404 N.Y.S.2d 206 (4th Dep't 1978) . . . . . . . . . . . . . . . . . . . . . . . 4

*Contec Corp. v. Remote Solution Co.,*
    398 F.3d 205 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Desiderio v. National Association of Securities Dealers,*
    191 F.3d 198 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ferguson v. Lion Holdings, Inc.,*
    312 F.Supp.2d 484 (S.D.N.Y. 2004) (Leisure, D.J.) . . . . . . . . . . . . . . . . . . . . . . . 2

*Opals on Ice Lingerie v. Bodylines, Inc.,*
    320 F.3d 362 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
    388 U.S. 395 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Savino v. Computer Credit, Inc.,*
    960 F.Supp. 599 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MILANA DRAVNEL,

                *Plaintiff,*

  – against –

OSCAR DE LA HOYA, and JOHN and/or JANE
DOES 1&2,

             *Defendants.*
------------------------------------------------------------X

Case No.: 07-cv-10406

Hon. Laura T. Swain

**ORAL ARGUMENT
REQUESTED_____**

### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT OSCAR DE LA HOYA'S MOTION TO COMPEL ARBITRATION

Defendant Oscar De La Hoya ("Defendant") respectfully submits this Reply

Memorandum of Law in support of his motion, pursuant to 9 U.S.C. §§ 3 and 4, to compel

arbitration of Plaintiff Milana Dravnel's ("Plaintiff") claims.[1]

### INTRODUCTION

Although Plaintiff has filed an Amended Complaint, dated January 2, 2008, (Exhibit A to

the accompanying Declaration of Judd Burstein) alleging a variety of frivolous new claims such

as "Product Libel" and "Compelled Self-Defamation," those changes do not moot Defendant's

motion because Plaintiff's claims for tortious interference and intentional infliction of emotional

distress remain in the case. Indeed, the only change brought about by the Amended Complaint is

that Plaintiff has now brought her defamation-based claims within the ambit of the September

2007 Agreement (the "Agreement") (Exhibit B to the Declaration of Judd Burstein submitted as

---

[1]     Defendant's original motion also sought, in the alternative, to dismiss the Original
Complaint, dated November 14, 2007. That motion has been obviated by the Amended
Complaint. Hence, contemporaneously with the submission of this Reply Memorandum of Law,
we are also submitting a new motion to dismiss the Amended Complaint.

part of Defendant's initial moving papers).  In contrast to the Original Complaint (Exhibit A to the Declaration of Judd Burstein submitted as part of Defendant's initial moving papers), which alleged only defamatory conduct that occurred after the execution of the Agreement (Original Complaint at ¶ 36), the Amended Complaint now alleges a host of supposedly defamatory statements made **before** the execution of the Agreement.  Accordingly, the defamation-based claims now fall within the Agreement's provision barring Plaintiff from "fil[ing] or pursu[ing] any lawsuit against DLH arising out of any matter which has occurred prior to the date hereof." (Agreement at ¶ 2).

We also take note of Plaintiff's inconsistent pleadings in this case.  In her first pleading, Plaintiff time and again affirmed the existence of the Agreement. (*See, e.g.*, Original Complaint at ¶¶ 11, 19, 34).  Indeed, she sought damages based upon the fact that she had been fraudulently induced into entering the Agreement.  In seeking those damages, Plaintiff necessarily reaffirmed that there had in fact been a meeting of the minds.  *See Ferguson v. Lion Holdings, Inc.*, 312 F.Supp.2d 484, 498 (S.D.N.Y. 2004) (Leisure, D.J.) (When a plaintiff claims fraud in the inducement and seeks damages rather than rescission, she is thereby affirming the contract). Then, when faced with a motion to compel arbitration, Plaintiff now suddenly claims that she never actually agreed to enter into the contract on which she had been seeking damages.

We understand that amendments of this nature are permitted by Fed. R. Civ. P. 15.  *See Savino v. Computer Credit, Inc.*, 960 F.Supp. 599, 601 (E.D.N.Y. 1997); *but see Baron v.*

2

*Rabinovic*, No. CV-05-0110, 2006 WL 1318426, at *1 (E.D.N.Y. May 12, 2006). Nonetheless, this studied attempt to plead around a motion to compel arbitration smacks of bad faith.

## ARGUMENT

### POINT I

#### DEFENDANT'S MOTION TO COMPEL SHOULD BE GRANTED

Before turning to a discussion of Plaintiff's arguments, we first note that Plaintiff has, by her silence, conceded (a) that arbitration of all of her non-defamation claims is required, and (b) that her defamation-based claims should be stayed.[2] That is, Plaintiff's **only** argument in her answering papers is that the Agreement is not enforceable.

A.    THE ISSUE OF WHETHER THE SUPPOSED ABSENCE OF ATTORNEY APPROVAL VITIATES THE SEPTEMBER 2007 AGREEMENT'S ARBITRATION CLAUSE MUST BE DECIDED BY THE ARBITRATOR

Plaintiff seeks to avoid arbitration because the Agreement includes the following hand-written language inserted above her signature: "Subject to further review by MD's Attorney." Based upon this language, Plaintiff argues that she is not required to arbitrate anything until the Court decides whether the Agreement ever came into effect. In advancing this argument, Plaintiff has misconstrued the inquiry to be made by the Court. The issue here is not the

---

[2]    As noted above, a stay is no longer necessary because the Amended Complaint's new allegations of defamatory conduct that predate the Agreement have brought Plaintiff's defamation claims within the ambit of the Agreement's arbitration clause. In any event, Plaintiff has conceded that a stay would be appropriate if some of her claims need to be arbitrated.

3

relevance and impact of the "attorney review" language, but **who decides that issue**. The law is clear that the issue is one that must be decided by an arbitrator.

Plaintiff's argument relies upon a host of cases in which courts held that real estate contracts never became binding because they had a provision explicitly requiring an affirmative act of attorney **approval** before they became effective.[3]   This case is fundamentally different because there is nothing in the Agreement which required affirmative attorney approval.  Rather, the Agreement stated only that it was subject to "further **review** by MD's attorney." (Emphasis supplied).

This is a crucial distinction in light of the accompanying Declaration of Stephen Espinoza, the representative of Defendant who executed the Agreement.  As explained in Mr. Espinoza's Declaration:

> When I came out to the street, Ms. Dravnel and Mr. Rubino were waiting by Mr. Rubino's car.  I handed them a clean copy of the agreement to sign.  At this point, Mr. Rubino [Ms. Dravnel's friend] stated that he and Ms. Dravnel wanted to show the agreement to an attorney solely for the purpose of seeing if any language needed to be clarified, and not to decide whether to enter into the agreement. Moreover, Mr. Rubino explicitly told me that I would hear from an attorney the next morning only if there were some language issues.  That is the reason I hand-wrote in "Subject to further review by MD's Attorney" above the signature line for Ms. Dravnel.

---

[3]       The only case that does not fall completely within this description is *Cohn v. Geon Intercontinental Corp.*, 62 A.D.2d 1161, 1162, 404 N.Y.S.2d 206, 209 (4th Dep't 1978). However, in *Cohn*, the defendant actually struck out the words "CONSENTED TO" before stating that the agreement was subject to his attorney's advice.  Moreover, in *Cohn*, the exact words used by the parties were not set forth in the decision.

4

Prior to her signing, I explicitly told Ms. Dravnel that she did not have to sign the agreement at that point, and that if she had an attorney, she should have it reviewed by the attorney before signing it. I made it crystal clear that Mr. de la Hoya would still be willing to sign the agreement the following day. Ms. Dravnel refused this offer and signed.

As we left each other, there was absolutely no doubt about the facts that (a) Ms. Dravnel and I had reached agreement, (b) she would be speaking to an attorney only for the purpose of determining if any language changes were needed to clarify the agreement, and (c) I would hear from that attorney the next morning only if there were any drafting issues.

No lawyer representing Ms. Dravnel ever called me the next day or at any time thereafter concerning the agreement she had signed.

(Declaration of Stephen Espinoza at ¶¶ 13-16).

In other words, this is not a case where there are undisputed facts demonstrating the parties' understanding that an agreement would not become effective unless there was an affirmative act of attorney approval. Rather there is a factual dispute in this case as to what the "attorney review" insertion means. Indeed, that is one of a number of factual issues to be resolved. For example, if Plaintiff had no intention of entering into the Agreement absent attorney approval, why did she voluntarily return hours later to meet with Mr. Espinoza to sign the agreement before showing it to an attorney? Also, given that the insertion only called for review, did she take the Agreement to an attorney? If she did so, and the attorney expressed no reservations, then the Agreement is surely valid by its own terms because it was "reviewed" by her attorney.

Given that the handwritten insertion does not demonstrate, as a matter of law, that the parties never formed a contract, we are left with the question of whether the Court or an

5

arbitrator should decide if the Agreement is an enforceable document. In answering this question, the following facts are relevant:

**First**, Plaintiff does not dispute that she signed the Agreement and that the Agreement contains an arbitration clause.[4]

**Second**, as noted above, Plaintiff does not dispute that the language of the arbitration clause covers at least some of her claims.

**Third**, Plaintiff does not make any claim that the arbitration clause, as opposed to the entire Agreement, is in any way unenforceable.

**Fourth**, the arbitration clause explicitly provides not only that "any and all disputes, claims, controversies and actions hereunder" shall be arbitrated by JAMS, it also provides that the arbitration is to be conducted "in accordance with the rules of JAMS."

**Fifth**, JAMS's rules explicitly provide:

> The Parties shall be deemed to have made these Rules a part of their Arbitration agreement whenever they have provided for Arbitration by JAMS under its Comprehensive Rules or for Arbitration by JAMS without specifying any particular JAMS Rules.

* * *

> Jurisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of the agreement under which

---

[4]     These facts distinguish this case from *Opals on Ice Lingerie v. Body Lines, Inc.*, 320 F.3d 362 (2d Cir. 2002). In *Opals*, the parties had signed two different versions of a contract, each of which contained a different arbitration clause providing for arbitration in different locales governed by different law. Here, in contrast, we have a single agreement signed by both parties.

6

Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(JAMS Rules 1(b) and 11(c)).

These facts are determinative in light of *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005), where the Court held that an arbitration clause's incorporation of AAA rules granting the arbitrator authority to decide questions of jurisdiction required that the arbitrator decide whether the parties had in fact agreed to arbitrate their disputes:

> The arbitration clause at issue here appears in paragraph 19 of the 1999 Agreement and provides:
>
> > In the event of any controversy arising with respect to this Agreement, both parties shall use its best efforts to resolve the controversy. In the event the parties are unable to arrive at a resolution, such controversy shall be determined by arbitration held in the City of Albany, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA")....
>
> Rule 7 of the AAA Commercial Arbitration Rules states with respect to jurisdiction that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Rule R-7(a).
>
> **We have held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as *clear and unmistakable evidence* of the parties' intent to delegate such issues to an arbitrator.**

(Bold and italic emphasis supplied); *accord Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 126 (2d Cir. 2006).

7

Here, we have an identical situation with the JAMS Rules. Indeed, the JAMS Rules are even more explicit than the AAA Rules relied upon in *Contec*, because JAMS's Rules provide for the arbitrator to decide the "existence" of an arbitration agreement.

Judge Wood's decision in *Bar-Ayal v. Time Warner Cable Inc.*, No. 03 CV 9905, 2006 WL 2990032 (S.D.N.Y. Oct. 16, 2006), makes our point. There, the plaintiff alleged that he had been charged improper fees in connection with his use of Time Warner's Roadrunner internet service. Time Warner argued that the dispute must be arbitrated because there was an arbitration clause in a contract that the plaintiff had to accept by a mouse click when running the start-up software. In response, the plaintiff contended that he had never even seen nor assented to the contract containing the arbitration clause. *Id.* at *4. Judge Wood acknowledged that, as here, the plaintiff was "challenging the existence (but not the 'validity') of the contract containing the arbitration provision." *Id.* at *7. Nonetheless, relying upon *Contec*, the Court concluded that an arbitrator must decide whether the parties had ever formed a contract because, *inter alia*, the arbitration provision at issue incorporated AAA's rules. *Id.* at *4.

This case is functionally indistinguishable from *Bar-Ayal* because in both cases (a) the party seeking to resist arbitration alleged that he or she had never entered into the contract that contained the arbitration clause in question, and (b) that the arbitration clause incorporated rules of an arbitration forum which granted the arbitrator jurisdiction to decide whether the parties had entered into any agreement. Hence, in light of *Contec* and *Bar-Aval*, the issue of whether the

8

"attorney advice" insertion negates the existence of the Agreement must be resolved in arbitration.

**B.    PLAINTIFF'S CLAIM THAT THE SEPTEMBER 2007 AGREEMENT IS UNCONSCIONABLE MUST ALSO BE RESOLVED BY THE ARBITRATOR**

In arguing that the Agreement is unenforceable because it is unconscionable, Plaintiff ignores the governing law. Put simply, since she alleges that the Agreement, as a whole, as opposed to just the arbitration clause, is unconscionable, that claim must be resolved in arbitration. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967); *Buckeye Check Cashing, Inc. v. Cardegna*, 126 S.Ct. 1204, 1209 (2006); *Bar-Ayal* at *15.[5]

The case primarily relied upon by Plaintiff, *Brennan v. Bally Total Fitness*, 198 F.Supp.2d 377 (S.D.N.Y. 2002) (Scheindlin, D.J.), is not to the contrary, and Plaintiff's citation of it is misleading because Plaintiff regrettably does not cite an earlier decision in the same case.

---

[5]    Although the Court need not reach the issue on this motion, Plaintiff's claim that the Agreement is unconscionable is likely sanctionable. "A contract or clause is unconscionable when there is an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Desiderio v. National Association of Securities Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999). As the Declaration of Mr. Espinoza makes clear, Plaintiff insisted upon multiple changes in the Agreement, there were multiple drafts created during the negotiation, and the Agreement was then signed only after Plaintiff went off on her own for a few hours and then came back to meet with Mr. Espinoza **at her request**. Indeed, **it was Plaintiff who requested the arbitration clause, calling for arbitration in New York pursuant to New York law, instead of a provision calling for litigation in the California courts pursuant California law**. Moreover, the terms of the Agreement are hardly unconscionable. This is made clear, *inter alia*, by the fact that the Agreement provides for $25,000 in liquidated damages for each breach by Plaintiff, but $250,000 in liquidated damages for each breach by Mr. De La Hoya. This disparity – plainly directed towards the disparate financial resources of the parties – demonstrates that the Agreement was not unreasonably favorable to Mr. De La Hoya.

9

In *Brennan v. Bally Total Fitness*, 153 F.Supp.2d. 408, 414 (S.D.N.Y. 2001), the Court held that it, rather than an arbitrator, would resolve an unconscionability claim only because the Court was not faced with "an arbitration clause within a contract, but an entire arbitration agreement" that contained no material terms broader than the obligation to arbitrate disputes arising out of the plaintiff's employment.    Here, in contrast, there are numerous other material terms in the Agreement beyond the arbitration clause.

## CONCLUSION

For the foregoing reasons, Defendant Oscar De La Hoya requests that the Court enter an Order compelling Plaintiff to arbitrate all of her claims in this case.

Dated: New York, New York
    January 8, 2008

Respectfully submitted,

Bertram Fields, Esq.
Jeffrey Spitz, Esq.
GREENBERG GLUSKER
1900 Avenue of the Stars
Los Angeles, California 90067
Tel:    (310) 201-7484

JUDD BURSTEIN, P.C.

By_____
Judd Burstein (JB-9585)
1790 Broadway
New York, New York 10019
Tel:    (212) 974-2400

*Attorneys for Defendant Oscar De La Hoya*

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MILANA DRAVNEL,

               *Plaintiff,*

  -- against --

OSCAR DE LA HOYA, and JOHN and/or JANE
DOES 1 & 2,

              *Defendants.*

-------------------------------------------------------------X

Case No.: 07-cv-10406

Hon. Laura T. Swain

**ORAL ARGUMENT
REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT OSCAR DE LA HOYA'S MOTION TO DISMISS THE AMENDED COMPLAINT

GREENBURG GLUSKER
1900 Avenue of the Stars
Los Angeles, California 90067
(310) 201-7484

- AND -

JUDD BURSTEIN, P.C.
1790 Broadway, Suite 1501
New York, New York 10019
(212) 974-2400

*Attorneys for Defendant
Oscar De La Hoya*

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT I

      PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM
      MUST BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT II

      PLAINTIFF'S ALLEGATIONS OF TORTIOUS INTERFERENCE
      WITH CONTRACT FAIL TO STATE A CLAIM
      UPON WHICH RELIEF MAY BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT III

      PLAINTIFF'S ALLEGATIONS OF INTENTIONAL INFLICTION
      OF EMOTIONAL DISTRESS FAIL TO STATE A CLAIM
      UPON WHICH RELIEF MAY BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT IV

      PLAINTIFF'S DEFAMATION ALLEGATIONS FAIL TO STATE A CLAIM UPON
      WHICH RELIEF MAY BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    BECAUSE PLAINTIFF HAS NOT PLEADED SLANDER *PER SE*,
            HER SLANDER CLAIM MUST BE DISMISSED, AS
            SHE HAS FAILED TO PLEAD SPECIAL DAMAGES
            WITH THE REQUISITE PARTICULARITY . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    PLAINTIFF'S OWN PUBLICATION OF THE SUPPOSED DEFAMATION
            REQUIRES DISMISSAL OF HER CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      C.    THE STATEMENTS ALLEGED TO HAVE BEEN MADE
            AFTER PLAINTIFF DISAVOWED THE PHOTOGRAPHS ARE NOT
            DEFAMATORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

i

POINT V

PLAINTIFF'S "PRODUCT LIBEL" ALLEGATIONS FAIL TO STATE A CLAIM
UPON WHICH RELIEF MAY BE GRANTED ............................... 13

POINT VI

PLAINTIFF'S "DEFAMATION BY COMPELLED
SELF-PUBLICATION"ALLEGATIONS FAIL TO STATE A CLAIM UPON WHICH
RELIEF MAY BE GRANTED .......................................... 13

CONCLUSION ........................................................ 15

TABLE OF AUTHORITIES

CASES

*American Maintenance Bldg. Co. Of New York v. Acme Property Services, Inc.,*
    No. 1:06-CV-1366, ___ F.Supp.2d ___,
    2007 WL 2492921 (N.D.N.Y. Aug. 29, 2007) ................................. 4

*Ascione v. Pfizer, Inc.,*
    312 F.Supp. 572 (S.D.N.Y. 2004) (Marrero, D.J) ............................. 13

*Bee Publication, Inc. v. Cheektowaga Times, Inc.,*
    107 A.D.2d 382, 485 N.T.S.2d 885 (4th Dep't 1985) .......................... 12

*Berwick v. New World Network International,*
    No. 06 Civ. 2641, 2007 WL 949767 (S.D.N.Y. Mar. 28, 2007) (Koeltl, D.J.) ........ 13

*Camp Summit of Summitville, Inc. v. Visinski,*
    No. 06-CV-4994, 2007 WL 1152894 (S.D.N.Y. Apr. 16, 2007) (McMahon, D.J.) ..... 5

*Carvel Corp. v. Noonan,*
    3 N.Y.3d 182, 785 N.Y.S.2d 359 (2004) ...................................... 5

*Celle v. Filipino Reporter Enterprises Inc.,*
    209 F.3d 163 (2d Cir. 2000) ................................................ 10

*Dellefave v. Access Temporaries, Inc.,*
    No. 99 Civ. 6098, 2001 WL 25745 (S.D.N.Y. Jan. 10, 2001) (Sweet, D.J.) ...... 10, 11

*Foley v. Mobil Chemical Co.,*
    214 A.D.2d 1003, 626 N.Y.S.2d 906 (4th Dep't 1995) .......................... 9

*Guard Life Corp. v. Parker Hardware Mfg. Corp.,*
    50 N.Y.2d 183, 428 N.Y.S.2d 628 (1980) ..................................... 5

*Howell v. New York Post Co., Inc.,*
    81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993) ...................... 8

*J. Crew Group, Inc. v. Griffin,*
    No. 90 Civ. 2663, 1990 WL 193918 (S.D.N.Y. Nov. 27, 1991) ................... 11

*Jaffe v. National League for Nursing,*
    222 A.D.2d 233, 635 N.Y.S.2d 9 (1st Dep't 1995) ............................. 9

*Kamerman v. Steinberg,*
        891 F.2d 424 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Kirch v. Liberty Media Corp.,*
        449 F.3d 388 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Leibowitz v. Bank Leumi Trust Co.,*
        152 A.D.2d 169, 548 N.Y.S.2d 513 (2d Dep't 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Liberman v. Gelstein,*
        80 N.Y.2d 429, 590 N.Y.S.2d 857 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Metchick v. Bidermann Indus. Corp.,*
        No. 91 Civ. 2329, 1993 WL 106139 (Apr. 7, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mobile Data Shred, Inc. v. United Bank of Switzerland,*
        No. 99 Civ. 10315, 2000 WL 351516 (S.D.N.Y. Apr. 5, 2000) . . . . . . . . . . . . . . . . . . . 4

*Murphy v. American Home Products Corp.,*
        58 N.Y.2d 293, 461 N.Y.S.2d 232 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Nunez v. A-T Financial Information Inc.,*
        957 F.Supp. 438 (S.D.N.Y. 1997) (Preska, D.J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Riddell Sports, Inc. v. Brooks,*
        872 F.Supp. 73 (S.D.N.Y. 1995) (Leisure, D.J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*S.E.C. v. Collins & Aikman Corp.,*
        No. 07 Civ. 2419, ___ F.Supp.2d ___,
        2007 WL 4480025 (S.D.N.Y. Dec. 21, 2007) (Scheindlin, D.J.) . . . . . . . . . . . . . . . . . . 6

*Van-Go Transport Co., Inc. v. New York City Board of Education,*
        971 F.Supp. 90 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

## STATUTES AND AUTHORITIES

Fed. R. Civ. P. 9(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
MILANA DRAVNEL,

                    *Plaintiff,*

   – against –

OSCAR DE LA HOYA, and JOHN and/or JANE
DOES 1&2,

                 *Defendants.*
-----------------------------------------------------X

Case No.: 07-cv-10406

Hon. Laura T. Swain

**ORAL ARGUMENT**
**REQUESTED**

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT OSCAR DE LA HOYA'S MOTION TO DISMISS THE AMENDED COMPLAINT

     Defendant Oscar De La Hoya ("Defendant") respectfully submits this memorandum of law in support of his motion, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(g), to dismiss the Amended Complaint for failure to state a claim upon which relief may be granted.[1]  The Amended Complaint, dated January 2, 2008, (Exhibit A to the accompanying Declaration of Judd Burstein) is an effort by Plaintiff Milana Dravnel ("Plaintiff") to meet the arguments set forth in Defendant's motion to dismiss the Original Complaint, dated November 14, 2007.  As we show below, this effort was a failure.

### STATEMENT OF THE FACTS

     As alleged in the Amended Complaint:

1.     From September of 2006, through May of 2007, Plaintiff and Defendant had a "personal relationship." (Amended Complaint at ¶ 12);

---

[1]     This Motion is submitted contemporaneously with and as a supplement to Defendant's Motion to Compel Arbitration.  Resolution of the issues raised herein will only be necessary if the Court denies the Motion to Compel Arbitration.

2.      During the course of their relationship, certain photographs were taken of Defendant with his consent. (Amended Complaint at ¶ 15);

3.      On or about September 16, 2007, "Plaintiff was approached to sell the photographs...." (Amended Complaint at ¶ 16);

4.      On or about September 18, 2007, Plaintiff sold the photos to x17Online ("X17") [a website] and "entered an agreement with X17 regarding the selling of additional interviews to other media outlets...." (Amended Complaint at ¶ 25);

5.      Plaintiff also entered into an agreement with R. Couri Hay Creative Public Relations, which arranged for her to give an interview to a syndicated television show. (Amended Complaint at ¶ 26);

6.      Following the television interview, Plaintiff and/or her representatives "began receiving calls from other large entertainment media groups, which ... expressed interest in interviewing Plaintiff and purchasing the photographs." (Amended Complaint at ¶ 28);

7.      In addition, R. Couri Hay Creative Public Relations was "also working on book, movie and other sponsorship deals regarding the photographs on behalf of Plaintiff." (Amended Complaint at ¶ 29);

8.      Defendant then placed pressure upon Plaintiff to cease disseminating the photographs by, *inter alia*, threatening to interfere with her citizenship and to sue her. (Amended Complaint at ¶¶ 30-31);

9.      Out of fear, Plaintiff met with two of Defendant's representatives on or about September 23, 2007. (Amended Complaint at ¶¶ 32-34); and

2

10.  Through the use of unspecified coercive tactics, "Plaintiff felt compelled to announce [and did announce] through the media, falsely, that the photographs were fabricated, altered, and were not genuine depictions of people or events." (Amended Complaint at ¶¶ 36-40).

Based upon these factual allegations, Plaintiff urges five claims for relief:

1.  A claim that Defendant tortiously interfered with the prospective media opportunities afforded by the photographs. (Amended Complaint at ¶¶ 43-47);

2.  A claim that Defendant tortiously interfered with Plaintiff's contract with X17. (Amended Complaint at ¶¶ 48-51);

3.  A claim that by reason of having "intimidating" and "coercing" Plaintiff to recant her claims that the photos were legitimate, Defendant intentionally inflicted emotional distress upon Plaintiff. (Amended Complaint at ¶¶ 52-56);

4.  A claim that Defendant, both personally and through his agents, defamed Plaintiff by stating that the photographs were fake. (Amended Complaint at ¶¶ 57-63);

5.  A claim that Defendant's public statements that the photographs were fake constituted "product libel." (Amended Complaint at ¶¶ 64-67); and

6.  A claim that Defendant coerced Plaintiff into defaming herself. (Amended Complaint at ¶¶ 68-71).

3

## ARGUMENT

## POINT I

## PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM MUST BE DISMISSED

As best we can understand it, Plaintiff does not allege that Defendant or any of his representatives communicated with any person or company with whom Plaintiff was supposedly negotiating for interviews, pictorials or the sale of her photographs. Rather, Plaintiff appears to be arguing that Defendant tortiously interfered with these prospective business opportunities by "coercing" her into publicly announcing that the photographs were fake. This claim fails for three reasons.

**First**, "[a]llegations of tortious interference must be more than just mere suspicions, and, therefore, the complaint must allege 'interference with a specific identified business relationship with a third party.'" *American Maintenance Bldg. Co. Of New York v. Acme Property Services, Inc.*, No. 1:06-CV-1366, ___ F.Supp.2d ___, 2007 WL 2492921, at *12 (N.D.N.Y. Aug. 29, 2007) (Citation omitted). As explained by Judge Scheindlin in *Mobile Data Shred, Inc. v. United Bank of Switzerland*, No. 99 Civ. 10315, 2000 WL 351516, at *7 (S.D.N.Y. Apr. 5, 2000):

> While proof of an existing contract is not necessary, the plaintiff must demonstrate interference with a specific identified business relationship with a third party. *See Business Networks of N.Y., Inc. v. Complete Network Solutions Inc.*, 696 N.Y.S.2d 433, 435 (1st Dep't 1999). Generalized allegations of impairment to plaintiff's ability to attract new business will not suffice. *See Allcar Motor Parts Corp. v. Federal-Mogul Corp.*, No. 96 Civ. 4419(JFK), 1998 WL 671448, at 6 (S.D.N.Y. Sept. 29, 1998). Because the complaint does not allege

4

any existing business relationship with a third party, MDS's claim of tortious interference with prospective business advantage must be dismissed.

Plaintiff has sought to cure a pleading deficiency in her Original Complaint by now alleging that "Playboy Magazine, Maximum Magazine, OK Magazine, and the Inquirer expressed interest in interviewing Plaintiff and purchasing the photographs." (Amended Complaint at ¶ 28). However, this allegation is not sufficient to withstand dismissal of the tortious interference claim, because the Amended Complaint does not claim that Plaintiff had an **existing** business relationship with any of these companies.

**Second**, because she has only alleged "interest" on the part of certain media companies, Plaintiff's claim must also be dismissed because, she has failed to "allege that, but for defendant's conduct, h[er] prospective business relations would have coalesced into actual contracts." *Riddell Sports, Inc. v. Brooks*, 872 F.Supp. 73, 78 (S.D.N.Y. 1995) (Leisure, D.J.); *accord Camp Summit of Summitville, Inc. v. Visinski*, No. 06-CV-4994, 2007 WL 1152894, at *15 (S.D.N.Y. Apr. 16, 2007) (McMahon, D.J.).

**Third**, the tortious interference claim fails because Plaintiff has not begun to allege, as she must, that Defendant tortiously interfered with her prospective contractual relations though "wrongful means." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 196, 428 N.Y.S.2d 628, 636 (1980). As explained by the Court in *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190, 785 N.Y.S.2d 359, 362 (2004), a plaintiff must allege that the defendant's conduct "amount to a crime or an independent tort" or was conduct engaged in "'for the sole purpose of inflicting intentional harm on plaintiffs....'" (Citation omitted).

5

Here, Plaintiff has failed to meet this burden. As an initial matter, Defendant's conduct could not possibly have been motivated solely by the desire to harm Plaintiff, as Defendant plainly had his own reputational interests at stake. Nor is there any adequate allegation of a tort or a crime. According to Plaintiff, Defendant did not interfere with Plaintiff's prospective business relations by communicating with third parties directly or through the media. Rather, the Amended Complaint explicitly alleges that the tortious interference was accomplished **solely** as a result of "Defendant coerc[ing] Plaintiff to state, falsely and publicly, that she could not verify the authenticity of the photographs." (Amended Complaint at ¶ 45).

Accordingly, the only possible "independent tort" allegedly committed by Defendant would be the tort of "coercion" – a tort for which Plaintiff does not seek damages. Nor could she have done so, because the tort of coercion requires proof of "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989). On a motion to dismiss a complaint, the Court "need not accord '[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness.'" *S.E.C. v. Collins & Aikman Corp.*, No. 07 Civ. 2419, __ F.Supp.2d __, 2007 WL 4480025, at *3 (S.D.N.Y. Dec. 21, 2007) (Scheindlin, D.J.) (Citation omitted). Rather, in order to survive a motion to dismiss, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" (*Id.*) (Citation omitted).

6

Here, the Amended Complaint's factual allegations do not meet this standard.  In the first instance, there is no adequate allegation of an unlawful threat.  Rather, the "threats" alleged by Defendant were (a) "to interfere with her pending United States citizenship application", and (b) to sue her. (Amended Complaint at ¶¶ 30-31).  Neither of these alleged threats – which Defendant denies having made – are unlawful.  Defendant surely has the right both to bring relevant information about a citizenship applicant to the government, and certainly has the right to seek relief in the Courts.  "[I]t is not duress to threaten to take action which is legally permissible." *Kamerman*, 891 F.2d at 432.

Further, there is no factual allegation in the Amended Complaint that would support the inference that "the circumstances permitted no other alternative" than for Plaintiff to recant her claim that the photographs were genuine. *Kamerman* 891 F.2d at 431.  Plainly, all that Plaintiff had to do was refuse to meet with Defendant's representatives or not make the telephone call.

Thus, Plaintiff's First Claim for Relief must be dismissed.

## POINT II

### PLAINTIFF'S ALLEGATIONS OF TORTIOUS INTERFERENCE WITH CONTRACT FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

If possible, Plaintiff's tortious interference with contract claim is even more frivolous than her tortious interference with prospective economic advantage claim.

> Under New York law, the elements of tortious interference with contract are (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) "damages resulting therefrom." *Lama*

7

*Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375, 646 N.Y.S.2d 76, 82 (1996).

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006).

 Here, Plaintiff's Second Claim for Relief alleges only that X17 rescinded its contract with Plaintiff because she had declared that the photographs were not genuine. There is no allegation by Plaintiff that, in rescinding the contract, X17 breached it. To the contrary, the Amended Complaint proceeds on the theory that X17 acted properly in light of Plaintiff's disavowal of the photographs' *bona fides*. In addition, there is no allegation that Defendant did or said anything to X17. Rather, the Amended Complaint plainly alleges that X17 terminated its contract with Plaintiff solely as a result of Plaintiff's recantation.

Thus, Plaintiff's Second Claim for Relief must be dismissed.

## POINT III

### PLAINTIFF'S ALLEGATIONS OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Plaintiff's Third Claim for Relief seeks damages for intentional infliction of emotional distress. "Under New York law, the tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Nunez v. A-T Financial Information Inc.* 957 F.Supp. 438, 442 (S.D.N.Y. 1997) (Preska, D.J.) (*Citing Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350 (1993)). "Courts have relied on the outrageousness element

8

to set reasonable bounds on this potentially limitless tort and have required that the plaintiff allege conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (*Quoting Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232 (1983)). The conduct alleged here does not approach this exacting standard.[2]

**POINT IV**

**PLAINTIFF'S DEFAMATION ALLEGATIONS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

Plaintiff's Third Claim for Relief alleges that she was slandered by Defendant and his agents' oral statements to the effect that the photographs were not genuine. This claim fails for three reasons: (a) since the alleged statements by Defendant and his agents do not amount to slander *per se*, the claim must be dismissed because Plaintiff has failed to adequately allege special damages, (b) the slander claim falls of its own weight because Plaintiff herself stated publicly that the photographs were not genuine, and (c) any statements made by Defendant and

---

[2]    *See, e.g., Leibowitz v. Bank Leumi Trust Co.*, 152 A.D.2d 169, 171, 548 N.Y.S.2d 513 (2d Dep't 1989) (No cognizable claim by Plaintiff who was the "only Jewish female" in her department and was frequently the subject of derogatory remarks, often being called a "Hebe" or a "kike."); *Foley v. Mobil Chemical Co.*, 214 A.D.2d 1003, 1005, 626 N.Y.S.2d 906 (4th Dep't 1995) (Despite the court's finding that defendants' alleged discrimination and sexual harassment was "wholly inappropriate" behavior, it was not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress); *Jaffe v. National League for Nursing*, 222 A.D.2d 233, 233, 635 N.Y.S.2d 9 (1st Dep't 1995) ("[A] case of alleged employee harassment and intimidation, leading to forced resignation ... [fell] far short of the rigorous standard of outrageous conduct necessary to maintain a cause of action for intentional infliction of emotional distress.").

his agents after Plaintiff publicly disavowed the photographs plainly were not alleging that it was

Plaintiff who manipulated the photographs.

**A.    BECAUSE PLAINTIFF HAS NOT PLEADED SLANDER *PER SE*, HER SLANDER CLAIM MUST BE DISMISSED, AS SHE HAS FAILED TO PLEAD SPECIAL DAMAGES WITH THE REQUISITE PARTICULARITY**

Under New York law:

> [s]lander as a rule is not actionable unless the plaintiff suffers special damage. The four established exceptions (collectively "slander per se") consist of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman. When statements fall within one of these categories, the law presumes that damages will result, and they need not be alleged or proven.

*Liberman v. Gelstein*, 80 N.Y.2d 429, 434-35, 590 N.Y.S.2d 857, 860-61 (1992).

The supposedly slanderous statements alleged in the Amended Complaint do not fall

within any of the four categories of slander *per se*.  Hence, Plaintiff is required to plead special

damages.  Moreover, she is also required, pursuant to Fed. R. Civ. P. 9(g), to plead such damages

with particularity.  She has failed to do so here, thereby requiring dismissal of her slander claim.

"Special damages consist of 'the loss of something having economic or pecuniary value

which must flow directly from the injury to reputation caused by the defamation,' as

distinguished from actual damages, which include additional harms such as impairment of

reputation and personal humiliation." *Dellefave v. Access Temporaries, Inc.*, No. 99 Civ. 6098,

2001 WL 25745, at *2 (S.D.N.Y. Jan. 10, 2001) (Sweet, D.J.) (*Citing Celle v. Filipino Reporter

Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000).  "[T]o satisfy the special damages

requirement, 'a plaintiff must set forth an itemized account of her losses; round figures or a

10

general allegation of a dollar amount as special damages will not suffice.'" *Nunez v. A-T Fin. Info. Inc.*, 957 F.Supp. 438, 441 (S.D.N.Y. 1997) (Preska, D.J.) (Citation omitted).  Absent this pleading, a complaint will be dismissed." *Dellefave*, 2001 WL 25745, at * 4.

There can be no doubt that the Amended Complaint does not meet this requirement. Rather, it alleges only that "Defendant's and his agents' defamatory statements injured Plaintiff's personal reputation and good name, to her damage, in the sum of $5,000,000."  (Amended Complaint at ¶ 63).

## B.    PLAINTIFF'S OWN PUBLICATION OF THE SUPPOSED DEFAMATION REQUIRES DISMISSAL OF HER CLAIM

Plaintiff's defamation claim fails by reason of another allegation in the Amended Complaint.  Specifically, Paragraph 62(f) of the Amended Complaint states that she was damaged by reason of Defendant having "compelled Plaintiff to make a false statement to New York Daily News reporter" that the photographs were not genuine.

This allegation, which essentially admits that any harm suffered by Plaintiff was self-inflicted, dooms Plaintiff's defamation claim.  As Judge Conboy stated in *J. Crew Group, Inc. v. Griffin*, No. 90 Civ. 2663, 1990 WL 193918 (S.D.N.Y. Nov. 27, 1991):

> Under New York law, it is well-settled that there can be no defamation without publication.... According to the general rule, if the person claiming to be defamed communicates the defamatory statements to another, no liability for any resulting damage is incurred by the originator of the statements. Thus, there is ordinarily "no publication if the defamatory statement is exposed to a third party by the person claiming to be defamed."

(Citations omitted).

11

**C.    THE STATEMENTS ALLEGED TO HAVE BEEN MADE AFTER PLAINTIFF DISAVOWED THE PHOTOGRAPHS ARE NOT DEFAMATORY**

Plaintiff's Amended Complaint alleges two types of supposedly defamatory statements: (a) those made before Plaintiff publicly stated to the *New York Daily News* that "I cannot personally verify the authenticity of the images.... These images were taken from my personal camera and were out of my control." (Amended Complaint at ¶ 62(f)), and (b) and those statements that were made after that statement.

For the reasons stated directly above, the statements allegedly made by Defendant and his agents before Plaintiff spoke with the *New York Daily News* are not actionable by reason of Plaintiff's own statement to that newspaper. As for the statements made subsequent to Plaintiff's discussion with the *New York Daily News*, they are not defamatory because they do not accuse Plaintiff of any wrongdoing. Rather, following Plaintiff's concession that the photographs were taken by third parties, any statements by Defendant that the pictures were doctored were not a statement about Plaintiff, but, rather, about a third party's conduct in doctoring the pictures. *Bee Publications, Inc. v. Cheektowaga Times, Inc.*, 107 A.D.2d 382, 384, 485 N.Y.S.2d 885, 888 (4th Dep't 1985) ("For there to be a recovery in libel it must be established that the defamation was 'of and concerning the plaintiff....'") (Citation omitted).

12

**POINT V**

**PLAINTIFF'S "PRODUCT LIBEL" ALLEGATIONS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

Plaintiff Fifth Claim for Relief, alleges "product libel" because Defendant's alleged statements "caus[ed] injury to the value or marketability of [the] photographs." (Amended Complaint at ¶ 66). The law is clear that claims of product disparagement require allegations and proof of special damages. *See Berwick v. New World Network International*, No. 06 Civ. 2641, 2007 WL 949767, at *15 (S.D.N.Y. Mar. 28, 2007) (Koeltl, D.J.). Here, as explained above in POINT IV, *supra*, Plaintiff has failed to adequately allege special damages, thereby requiring dismissal of her Fifth Claim for Relief.

**POINT VI**

**PLAINTIFF'S "DEFAMATION BY COMPELLED SELF-PUBLICATION" ALLEGATIONS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

Plaintiff also contends that she has been damaged because Defendant "coerced" her into denigrating the photos. As with her other claims, this one is meritless.

"The status of the tort of defamation by 'compelled self-publication' is, at best, unclear under New York law." *Ascione v. Pfizer, Inc.*, 312 F.Supp.2d 572, 579, n.5 (S.D.N.Y. 2004) (Marrero, D.J.). *See, e.g., Metchick v. Bidermann Indus. Corp.*, No. 91 Civ. 2329, 1993 WL 106139, at *4 (Apr. 7, 1993) (discussing uncertainty). However, even if the "compelled self-publication" theory were recognized in New York, it would be inapplicable here. As explained by the Court on *Van-Go*, a claim of "compelled self-publication" would be available only in

13

those circumstances where a plaintiff could demonstrate a "lack of control over the publication," by reason of a legal obligation to make disclosure, or the necessity of explaining to a prospective employer the reason for a past discharge. *Van-Go Transport Co., Inc. v. New York City Board of Education*, 971 F.Supp. 90, 104 (E.D.N.Y. 1997). The allegations in the Amended Complaint do not begin to meet this standard.[3]

---

[3]     Plaintiff's claim also fails because she does not allege any special damages.

14

## CONCLUSION

For the foregoing reasons, Defendant Oscar De La Hoya requests that the Court enter an

Order dismissing the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(g).

Dated: New York, New York
       January 8, 2008

Respectfully submitted,

Bertram Fields, Esq.
Jeffrey Spitz, Esq.
GREENBERG GLUSKER
1900 Avenue of the Stars
Los Angeles, California 90067
Tel:    (310) 201-7484

JUDD BURSTEIN, P.C.

By
Judd Burstein (JB-9585)
1790 Broadway
New York, New York 10019
Tel:    (212) 974-2400

*Attorneys for Defendant Oscar De La Hoya*

15

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MILANA DRAVNEL,

               *Plaintiff,*

    -- against --

OSCAR DE LA HOYA, and JOHN and/or JANE
DOES 1&2,

              *Defendant.*
-------------------------------------------------------------X

07 CIV 10406 (LTS)

**DECLARATION OF
STEPHEN ESPINOZA**

**STEPHEN ESPINOZA** hereby declares under penalty of perjury:

1.     I am an attorney duly admitted to the California Bar.  For the past seven years, I have represented Oscar de la Hoya with respect to many of his business affairs.

2.     In September of 2007, I became aware that someone was claiming to have photographs of Mr. de la Hoya in embarrassing poses and was offering such photographs for sale.  Shortly thereafter, x17online.com ("x17") posted photographs which x17 stated "appear[ed] to be" of Mr. de la Hoya.  It was subsequently reported by x17 and other media that Ms. Dravnel had provided the photographs to x17.

3.     Mr. de la Hoya, through counsel, responded by publicly stating that the x17 photographs were fake and that the matter was being referred to his legal counsel.

4.     Shortly thereafter, Ms. Dravnel contacted one of Mr. de la Hoya's colleagues and requested a meeting with Mr. de la Hoya or one of his representatives to discuss how she could recant her claim that the photos were genuine.

1

5.      On September 23, 2007, Glenn Bunting (a publicist for Mr. de la Hoya) and I met with Ms. Dravnel and her friend, Richard Rubino. The meeting took place in New York City. It is again important to emphasize that this meeting took place because Ms. Dravnel requested it.

6.      The meeting commenced at approximately 1:00 p.m. and lasted until approximately 6:30 p.m. At the outset, Ms. Dravnel and Mr. Rubino confirmed Ms. Dravnel's intention to publicly retract her previous statements that the photos of Mr. de la Hoya were genuine. They informed me that Ms. Dravnel was frightened that if she retracted her previous claims that the photos were genuine, she would then be sued by both Mr. de la Hoya and x17, and potentially other parties as well.

7.      Ms. Dravnel then requested that Mr. de la Hoya agree to forego suing her and to indemnify her from third party lawsuits resulting from her decision to retract her prior statements. In response, I made it clear that, although Mr. de la Hoya would never pay Ms. Dravnel to stop or hinder publication of the photographs, he would be willing to forego suing her and also indemnify her so long as he had assurances (a) that Ms. Dravnel would agree to strict confidentiality both with respect to the settlement and any dealings she may have had with Mr. de la Hoya, (b) that she would not in any way seek to advance her own interests through press interviews, the use of Mr. de la Hoya's name or any images of him that she might claim to possess, (c) that we agree on a liquidated damages provision to deter her from breaching her obligations of confidentiality, and (d) that Mr. de la Hoya and Ms. Dravnel would exchange releases.

2

8.      Ms. Dravnel and Mr. Rubino agreed to these terms in principle, and I drafted an agreement documenting these terms. I am informed that Ms. Dravnel and Mr. Rubino claim that the agreement she ultimately signed was thrust upon her with no opportunity to negotiate. This is completely untrue. Rather, as shown by Exhibit A hereto, the agreement was modified during our discussions. For example, as shown by Exhibit A, the agreement provides for Ms. Dravnel to pay $25,000 in liquidated damages each time she breaches the agreement, whereas Mr. de la Hoya is obligated to pay liquidated damages of $250,000 each time he breaches. The $250,000 figure for Mr. de la Hoya was inserted at Ms. Dravnel's and Mr. Rubino's request. Further, as shown by Exhibit A, it was Ms. Dravnel and Mr. Rubino who asked that the provision for disputes to be resolved in California under California law be replaced by a provision calling for dispute resolution in New York under New York law. In the process of discussing this provision, Ms. Dravnel and Mr. Rubino expressly stated that they agreed that private, confidential and binding arbitration would be in the best interests of both parties (*i.e.*, Ms. Dravnel and Mr. de la Hoya).

9.      Significantly, I asked both Ms. Dravnel and Mr. Rubino numerous times whether Ms. Dravnel had a lawyer and, if she did, how I could fax or e-mail him the various drafts or speak with him directly. On each occasion, I was rebuffed.

10.     As the end of the afternoon approached, we still did not have a signed agreement. Nonetheless, Ms. Dravnel made an independent decision to conduct an interview with a *New*

3

*York Daily News* reporter in which she acknowledged that she could not verify the authenticity of the photos sold to x17.

11.    Following her interview with the reporter, somewhere around 6:30 p.m., Ms. Dravnel and Mr. Rubino informed me that they wanted to review the last draft of the agreement before deciding what to do, and they left.

12.    A couple of hours later, Mr. Rubino called me on my cell phone to inform me that Ms. Dravnel wanted to sign the last draft of the agreement in order to confirm the agreement between the parties. I then agreed to meet them at my hotel. Mr. Rubino called me again when they arrived outside the hotel, and I agreed to go outside to meet them.

13.    When I came out to the street, Ms. Dravnel and Mr. Rubino were waiting by Mr. Rubino's car. I handed them a clean copy of the agreement to sign. At this point, Mr. Rubino [Ms. Dravnel's friend] stated that he and Ms. Dravnel wanted to show the agreement to an attorney solely for the purpose of seeing if any language needed to be clarified, and not to decide whether to enter into the agreement. Moreover, Mr. Rubino explicitly told me that I would hear from an attorney the next morning only if there were some language issues. That is the reason I hand-wrote in "Subject to further review by MD's Attorney" above the signature line for Ms. Dravnel.

14.    Prior to her signing, I explicitly told Ms. Dravnel that she did not have to sign the agreement at that point, and that if she had an attorney, she should have it reviewed by the

4

attorney before signing it.    I made it crystal clear that Mr. de la Hoya would still be willing to sign the agreement the following day. Ms. Dravnel refused this offer and signed.

15.    As we left each other, there was absolutely no doubt about the facts that (a) Ms. Dravnel and I had reached agreement, (b) she would be speaking to an attorney only for the purpose of determining if any language changes were needed to clarify the agreement, and (c) I would hear from that attorney the next morning only if there were any drafting issues.

16.    No lawyer representing Ms. Dravnel ever called me the next day or at any time thereafter concerning the agreement she had signed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 7th day of January, 2008 in Los Angeles, California.

STEPHEN ESPINOZA

5

EXHIBIT A

## AGREEMENT

The following sets forth the terms of the agreement ("Agreement"), dated as of September 22, 2007, between Malina Dravnel ("MD") and Oscar De La Hoya ("DLH"). In consideration of the reciprocal commitments and mutual benefits hereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

0.    MD acknowledges that she, on her own initiative, approached DLH's representatives and initiated the discussions which have resulted in this Agreement. MD acknowledges that the purpose for initiating contact with DLH's representative was to advise them of her intention to publicly recant and retract her prior public statements regarding DLH and to publicly announce that the images that had been previously posted to the internet had been taken from MD's camera by a third party without her consent and had been altered and to seek DLH's consent and approval of her public statement(s) ((collectively, the "Statements"). MD acknowledges that she has not requested, nor has DLH agreed, to pay or to cause any other party to pay to her, any financial compensation in connection with this Agreement or otherwise as consideration for the Statements.

1.    MD represents and warrants that she has not entered into any agreement with any third party regarding DLH, or any photograph or image purporting to depict DLH, other than X17. Pursuant to MD's request, but subject to MD actually publicly making the Statements as mutually agreed by MD and DLH, DLH: (a) shall indemnify MD against all reasonable legal fees paid or incurred by MD for the defense of any third party lawsuit, whether filed domestically and/or internationally, against MD at any time after the date hereof, worldwide, claiming that the Statements constitute a breach of an agreement between MD and a third party; and (b) agrees not to file or pursue any lawsuit against MD arising out of any publication of photographs or interviews given by MD which occurred prior to the date hereof. MD agrees not to file or pursue any lawsuit against DLH arising out of any matter which has occurred prior to the date hereof.——

3.    MD shall keep this Agreement and the terms hereof strictly confidential. Without limiting the generality of the foregoing, MD shall not use, divulge, disseminate, discuss, refer to, or acknowledge the existence of, publish, reproduce or otherwise disclose (or authorize or permit any third party to do any of the above): (a) this Agreement or the terms hereof; (b) any information regarding DLH; or (c) any photographs or images of DLH. In addition, after the date hereof MD shall not, without DLH's prior written consent, grant or participate in any interviews or articles, make any public statement or otherwise discuss or divulge any information regarding DLH. In the event of any -breach or violation by MD of the terms of this Paragraph 3, then DLH shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $25,000 for each violation hereof. Likewise in the event of any breach or violation by DLH of DLH's obligations pursuant to Paragraph 2, then MD shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $250,000 for each violation hereof. In addition, MD agrees that In the event of any breach, alleged breach or violation of the terms of this Paragraph 3, then DLH shall sustain irreparable damage and damage which is difficult, and DLH shall therefore be entitled to injunctive and/or other equitable remedy to prevent and/or remedy any such breach or violation, and MD agrees not to oppose any such injunctive or other equitable remedy.

4.    Notwithstanding anything to the contrary contained herein, and without prejudice to any other remedies set forth herein or otherwise at law or in equity, <u>DLH's obligations under</u> Paragraph 2 shall be null and void, and DLH shall be fully released from all <u>of his</u> covenants and obligations thereunder, in the event of any breach, alleged breach or violation by MD of the terms of Paragraphs 2 or ~~and~~ 3 above.

5.    This is the entire agreement between MD and DLH regarding the subject matter hereof. <u>MD acknowledges</u>~~MD acknowledged~~ that neither DLH nor any other party has made any promises to her other than those contained in this Agreement. This Agreement may not be amended or modified in any way, except pursuant to a written instrument signed by both parties. MD acknowledges that she has been ~~advise~~<u>advised</u> to consult with an attorney before signing this Agreement and that she has had a reasonable opportunity to do so.

6.    Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any applicable law, ~~rule or regulation,~~ and if there shall exist any conflict between any provision of this Agreement and any such law, ~~rule or regulation,~~ the latter shall prevail and the pertinent provision or provisions of this Agreement shall be curtailed, limited or eliminated to the extent necessary to remove such conflict, and as so modified, this Agreement shall continue in full force and effect. In the event that one or more of the provisions of this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be in any way affected or impaired thereby.

7.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of <u>New York</u>~~California~~ applicable to agreements made and to be fully performed therein. Any and all disputes, claims, controversies and actions hereunder shall <u>be resolved by private, confidential arbitration in New York, NY pursuant to the rules of JAMS. Each party shall have a right of appeal to a three-arbitrator panel, which appeal shall also be conducted by private, confidential arbitration in accordance with the rules of JAMS</u>~~subject to exclusive venue and jurisdiction of the state and federal courts sitting in the County of Los Angeles~~.

<u>MD ACKNOWLEDGES</u>
~~YOU ACKNOWLEDGE~~ THAT <u>SHE HAS</u>~~YOU HAVE~~ CAREFULLY READ THIS AGREEMENT<u>, UNDERSTANDS</u> ~~AND RELEASE,~~ UNDERSTAND IT, AND <u>IS</u>~~ARE~~ VOLUNTARILY ENTERING INTO IT OF <u>HER</u>~~YOUR~~ OWN FREE WILL, WITHOUT DURESS OR COERCION, AFTER DUE CONSIDERATION OF ITS TERMS AND CONDITIONS. <u>MD</u>~~YOU~~ FURTHER ACKNOWLEDGE<u>S</u> THAT EXCEPT AS STATED IN THIS AGREEMENT, <u>NEITHER DLH NOR</u> ~~THE COMPANY OR~~ ANY REPRESENTATIVE OF <u>DLH</u>~~THE COMPANY~~ HAS MADE <u>ANY</u>~~NO~~ OTHER REPRESENTATIONS OR PROMISES TO <u>HER</u>~~YOU~~.

_____
Milana Dravnel
_____
Date:_____

_____
Oscar De La Hoya
<u>By Stephen Espinoza, Authorized Representative</u>
Date:_____

- 2 -

AGREED AND ACCEPTED, AS TO THE CONFIDENTIALITY PROVISIONS OF PARAGRAPH 3 ONLY:

_____
Richard Rubino