UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MILANA DRAVNEL,

                  Plaintiff,                **DECLARATION OF**
                                                         **MILANA DRAVNEL**
   -against-

OSCAR DE LA HOYA, and
JOHN and/or JANE DOES 1 & 2,          Hon. Laura T. Swain
                                                    Case No.: 07-cv-10406
                  Defendants.

-----------------------------------------------------------X

      I, MILANA DRAVNEL, declare as follows:

1. I am the Plaintiff in the above-entitled matter. I am fully familiar with the facts and circumstances of this case.

2. I make this Declaration in opposition to Defendant's motion to compel arbitration.

3. On September 23, 2007, I met with representatives of Defendant Oscar De La Hoya (hereinafter "Mr. De La Hoya") regarding photographs I had of Mr. De La Hoya dressed in women's clothing. My friend, Richard Rubino, accompanied me to the meeting.

3. On September 23, 2007, Stephen Espinoza (hereinafter "attorney Espinoza"), an attorney, and Glen Bunting (hereinafter "Bunting"), a publicist with Sitrick and Company, introduced themselves to me as Mr. De La Hoya's representatives (hereinafter collectively "De La Hoya's representatives").

4. Both attorney Espinoza and Bunting stated they had flown to New York from California for one day to meet with me.

5.  Mr. Rubino, attorney Espinoza, and I met for approximately 1.5 hours at a deli near Espinoza's hotel to discuss the photographs.

6.  I told attorney Espinoza and Bunting more than once that the photographs were authentic and real.

7.  Attorney Espinoza and Bunting, the publicist, were anxious to obtain an agreement from me relating to Mr. De La Hoya and the photographs.

8.  Attorney Espinoza drafted an agreement for me to sign.

9.  I told attorney Espinoza that I would not sign any agreement until after my attorneys had reviewed and approved it.

10. I am 22 years old. I immigrated from Russia when I was 12 years old. I did not graduate high school, and have only recently obtained my GED. I have no legal training.

11. I never agreed to the terms of the agreement drafted by attorney Espinoza, and I certainly never agreed to arbitrate any matters relating to the supposed agreement. On September 23, 2007, I did not even know what arbitration was.

12. Attorney Espinoza and Bunting stressed that they were flying out the following day, and that I had to sign the agreement before they left.

13. I left the meeting on September 23, 2007, with a copy of an unsigned agreement.

14. After leaving the meeting, I discussed the proposed agreement with Mr. Rubino.

15. I then returned to attorney Espinoza's hotel and met him in the lobby. I informed attorney Espinoza that if he would add language to the agreement stating that the agreement would not be effective or valid until after I had my attorneys review and approve it, then I would sign it that day. It was clearly explained to attorney Espinoza that if I signed the agreement, that it was subject to approval and review by my attorneys.

16. Mr. Rubino also explained to attorney Espinoza that I would sign the agreement only if he added a clause stating that the agreement would not become a binding contract until my attorneys reviewed and approved it.

17. Attorney Espinoza then wrote above the signature line for my name "SUBJECT TO APPROVAL BY MD'S ATTORNEY."

18. I then placed my signature on the paper.

19. I have never given Mr. De La Hoya or his representatives any information that would lead them to believe that any of my attorneys have approved the proposed agreement.

20. I was very clear in my meetings with Mr. De La Hoya's representatives, that the agreement would not be binding unless and until my attorneys reviewed it and approved it.

21. When I left Mr. De La Hoya's representatives on September 23, 2007, I did not believe we had entered into a binding contract. I believed that in order for it to become binding, my attorneys would have to review it and agree to it.

22. A copy of the agreement referred to herein is attached as <u>EXHIBIT "1"</u>.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 30th day of December 2007, in Kings County, New York.

_____
MILANA DRAVNEL

EXHIBIT 1

# AGREEMENT

The following sets forth the terms of the agreement ("Agreement"), dated as of September 22, 2007, between Malina Dravnel ("MD") and Oscar De La Hoya ("DLH"). In consideration of the reciprocal commitments and mutual benefits hereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. MD acknowledges that she, on her own initiative, approached DLH's representatives and initiated the discussions which have resulted in this Agreement. MD acknowledges that the purpose for initiating contact with DLH's representative was to advise them of her intention to publicly recant and retract her prior public statements regarding DLH and to publicly announce that the images that had been previously posted to the internet had been taken from MD's camera by a third party without her consent and had been altered and to seek DLH's consent and approval of her public statement(s) (the "Statements"). MD acknowledges that she has not requested, nor has DLH agreed, to pay or to cause any other party to pay to her any financial compensation in connection with this Agreement or otherwise.

2. MD represents and warrants that she has not entered into any agreement with any third party regarding DLH, or any photograph or image purporting to depict DLH other than X17. Pursuant to MD's request, but subject to MD actually publicly making the Statements as mutually agreed by MD and DLH, DLH: (a) shall indemnify MD against all legal fees paid or incurred by MD for the defense of any third party lawsuit, whether filed domestically and/or internationally, against MD at any time after the date hereof claiming that the Statements constitute a breach of an agreement between MD and a third party; and (b) agrees not to file or pursue any lawsuit against MD arising out of any publication of photographs or interviews given by MD which occurred prior to the date hereof. MD agrees not to file or pursue any lawsuit against DLH arising out of any matter which has occurred prior to the date hereof.

3. MD shall keep this Agreement and the terms hereof strictly confidential. Without limiting the generality of the foregoing, MD shall not use, divulge, disseminate, discuss, refer to or acknowledge the existence of, publish, reproduce or otherwise disclose (or authorize or permit any third party to do any of the above) (a) this Agreement or the terms hereof, (b) any information regarding DLH, or (c) any photographs or images of DLH. In addition, after the date hereof MD shall not, without DLH's prior written consent, grant or participate in any interviews or articles, make any public statement or otherwise discuss or divulge any information regarding DLH. In the event of any breach or violation by MD of the terms of this Paragraph 3, then DLH shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $25,000 for each violation hereof. Likewise in the event of any breach or violation by DLH of DLH's obligations pursuant to Paragraph 2, then MD shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $250,000 for each violation hereof. In addition, MD agrees that In the event of any breach, alleged breach or violation of the terms of this Paragraph 3, then DLH shall sustain irreparable damage and damage which is difficult, and DLH shall therefore be entitled to injunctive and/or other equitable remedy to prevent and/or remedy any such breach or violation, and MD agrees not to oppose any such injunctive or other equitable remedy.

4. Notwithstanding anything to the contrary contained herein, and without prejudice to any other remedies set forth herein or otherwise at law or in equity, DLH's obligations under Paragraph 2

shall be null and void, and DLH shall be fully released from all of his covenants and obligations thereunder, in the event of any breach, alleged breach or violation by MD of the terms of Paragraphs 2 or 3 above.

5. This is the entire agreement between MD and DLH regarding the subject matter hereof. MD acknowledges that neither DLH nor any other party has made any promises to her other than those contained in this Agreement. This Agreement may not be amended or modified in any way, except pursuant to a written instrument signed by both parties. MD acknowledges that she has been advise to consult with an attorney before signing this Agreement and that she has had a reasonable opportunity to do so.

6. Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any applicable law, rule or regulation, and if there shall exist any conflict between any provision of this Agreement and any such law, rule or regulation, the latter shall prevail and the pertinent provision or provisions of this Agreement shall be curtailed, limited or eliminated to the extent necessary to remove such conflict, and as so modified, this Agreement shall continue in full force and effect. In the event that one or more of the provisions of this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be in any way affected or impaired thereby.

7. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be fully performed therein. Any and all disputes, claims, controversies and actions hereunder shall be resolved by private, confidential arbitration in New York, NY pursuant to the rules of JAMS. Each party shall have a right of appeal to a three-arbitrator panel, which appeal shall also be conducted by private, confidential arbitration in accordance with the rules of JAMS.

MD ACKNOWLEDGES THAT SHE HAS CAREFULLY READ THIS AGREEMENT, UNDERSTANDS IT, AND IS VOLUNTARILY ENTERING INTO IT OF HER OWN FREE WILL, WITHOUT DURESS OR COERCION, AFTER DUE CONSIDERATION OF ITS TERMS AND CONDITIONS. MD FURTHER ACKNOWLEDGES THAT EXCEPT AS STATED IN THIS AGREEMENT, NEITHER DLH NOR ANY REPRESENTATIVE OF DLH HAS MADE ANY OTHER REPRESENTATIONS OR PROMISES TO HER.

SUBJECT TO FURTHER REVIEW BY MD'S RETND ATTRNY

_____  _____
Milana Dravnel                   Oscar De La Hoya
                                 By Stephen Espinoza, Authorized Representative
Date:_____           Date: 9/26/07

AGREED AND ACCEPTED, AS TO THE CONFIDENTIALITY PROVISIONS OF PARAGRAPH 3 ONLY:

_____
Richard Rubino

-2-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MILANA DRAVNEL,

                           Plaintiff,           **DECLARATION OF**
                                                        **MILANA DRAVNEL**
   -against-

OSCAR DE LA HOYA, and
JOHN and/or JANE DOES 1 & 2,          Hon. Laura T. Swain
                                                        Case No.: 07-cv-10406
                          Defendants.

-----------------------------------------------------------X

      I, MILANA DRAVNEL, declare as follows:

1.    I am the Plaintiff in the above-entitled matter. I am fully familiar with the facts and circumstances of this case.

2.    I make this Declaration in opposition to Defendant's motion to compel arbitration.

3.    On September 23, 2007, I met with representatives of Defendant Oscar De La Hoya (hereinafter "Mr. De La Hoya") regarding photographs I had of Mr. De La Hoya dressed in women's clothing. My friend, Richard Rubino, accompanied me to the meeting.

3.    On September 23, 2007, Stephen Espinoza (hereinafter "attorney Espinoza"), an attorney, and Glen Bunting (hereinafter "Bunting"), a publicist with Sitrick and Company, introduced themselves to me as Mr. De La Hoya's representatives (hereinafter collectively "De La Hoya's representatives").

4.    Both attorney Espinoza and Bunting stated they had flown to New York from California for one day to meet with me.

5. Mr. Rubino, attorney Espinoza, and I met for approximately 1.5 hours at a deli near Espinoza's hotel to discuss the photographs.

6. I told attorney Espinoza and Bunting more than once that the photographs were authentic and real.

7. Attorney Espinoza and Bunting, the publicist, were anxious to obtain an agreement from me relating to Mr. De La Hoya and the photographs.

8. Attorney Espinoza drafted an agreement for me to sign.

9. I told attorney Espinoza that I would not sign any agreement until after my attorneys had reviewed and approved it.

10. I am 22 years old. I immigrated from Russia when I was 12 years old. I did not graduate high school, and have only recently obtained my GED. I have no legal training.

11. I never agreed to the terms of the agreement drafted by attorney Espinoza, and I certainly never agreed to arbitrate any matters relating to the supposed agreement. On September 23, 2007, I did not even know what arbitration was.

12. Attorney Espinoza and Bunting stressed that they were flying out the following day, and that I had to sign the agreement before they left.

13. I left the meeting on September 23, 2007, with a copy of an unsigned agreement.

14. After leaving the meeting, I discussed the proposed agreement with Mr. Rubino.

15. I then returned to attorney Espinoza's hotel and met him in the lobby. I informed attorney Espinoza that if he would add language to the agreement stating that the agreement would not be effective or valid until after I had my attorneys review and approve it, then I would sign it that day. It was clearly explained to attorney Espinoza that if I signed the agreement, that it was subject to approval and review by my attorneys.

16. Mr. Rubino also explained to attorney Espinoza that I would sign the agreement only if he added a clause stating that the agreement would not become a binding contract until my attorneys reviewed and approved it.

17. Attorney Espinoza then wrote above the signature line for my name "SUBJECT TO APPROVAL BY MD'S ATTORNEY."

18. I then placed my signature on the paper.

19. I have never given Mr. De La Hoya or his representatives any information that would lead them to believe that any of my attorneys have approved the proposed agreement.

20. I was very clear in my meetings with Mr. De La Hoya's representatives, that the agreement would not be binding unless and until my attorneys reviewed it and approved it.

21. When I left Mr. De La Hoya's representatives on September 23, 2007, I did not believe we had entered into a binding contract. I believed that in order for it to become binding, my attorneys would have to review it and agree to it.

22. A copy of the agreement referred to herein is attached as EXHIBIT "1".

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 30th day of December 2007, in Kings County, New York.

_____
MILANA DRAVNEL

3

EXHIBIT 1

# AGREEMENT

The following sets forth the terms of the agreement ("Agreement"), dated as of September 22, 2007, between Malina Dravnel ("MD") and Oscar De La Hoya ("DLH"). In consideration of the reciprocal commitments and mutual benefits hereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. MD acknowledges that she, on her own initiative, approached DLH's representatives and initiated the discussions which have resulted in this Agreement. MD acknowledges that the purpose for initiating contact with DLH's representative was to advise them of her intention to publicly recant and retract her prior public statements regarding DLH and to publicly announce that the images that had been previously posted to the internet had been taken from MD's camera by a third party without her consent and had been altered and to seek DLH's consent and approval of her public statement(s) (the "Statements"). MD acknowledges that she has not requested, nor has DLH agreed, to pay or to cause any other party to pay to her any financial compensation in connection with this Agreement or otherwise.

2. MD represents and warrants that she has not entered into any agreement with any third party regarding DLH, or any photograph or image purporting to depict DLH other than X17. Pursuant to MD's request, but subject to MD actually publicly making the Statements as mutually agreed by MD and DLH, DLH: (a) shall indemnify MD against all legal fees paid or incurred by MD for the defense of any third party lawsuit, whether filed domestically and/or internationally, against MD at any time after the date hereof claiming that the Statements constitute a breach of an agreement between MD and a third party; and (b) agrees not to file or pursue any lawsuit against MD arising out of any publication of photographs or interviews given by MD which occurred prior to the date hereof. MD agrees not to file or pursue any lawsuit against DLH arising out of any matter which has occurred prior to the date hereof.

3. MD shall keep this Agreement and the terms hereof strictly confidential. Without limiting the generality of the foregoing, MD shall not use, divulge, disseminate, discuss, refer to or acknowledge the existence of, publish, reproduce or otherwise disclose (or authorize or permit any third party to do any of the above) (i) this Agreement or the terms hereof, (ii) any information regarding DLH, or (iii) any photographs or images of DLH. In addition, after the date hereof MD shall not, without DLH's prior written consent, grant or participate in any interviews or articles, make any public statement or otherwise discuss or divulge any information regarding DLH. In the event of any breach or violation by MD of the terms of this Paragraph 3, then DLH shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $25,000 for each violation hereof. Likewise in the event of any breach or violation by DLH of DLH's obligations pursuant to Paragraph 2, then MD shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $250,000 for each violation hereof. In addition, MD agrees that In the event of any breach, alleged breach or violation of the terms of this Paragraph 3, then DLH shall sustain irreparable damage and damage which is difficult, and DLH shall therefore be entitled to injunctive and/or other equitable remedy to prevent and/or remedy any such breach or violation, and MD agrees not to oppose any such injunctive or other equitable remedy.

4. Notwithstanding anything to the contrary contained herein, and without prejudice to any other remedies set forth herein or otherwise at law or in equity, DLH's obligations under Paragraph 2

shall be null and void, and DLH shall be fully released from all of his covenants and obligations thereunder, in the event of any breach, alleged breach or violation by MD of the terms of Paragraphs 2 or 3 above.

5. This is the entire agreement between MD and DLH regarding the subject matter hereof. MD acknowledges that neither DLH nor any other party has made any promises to her other than those contained in this Agreement. This Agreement may not be amended or modified in any way, except pursuant to a written instrument signed by both parties. MD acknowledges that she has been advise to consult with an attorney before signing this Agreement and that she has had a reasonable opportunity to do so.

6. Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any applicable law, rule or regulation, and if there shall exist any conflict between any provision of this Agreement and any such law, rule or regulation, the latter shall prevail and the pertinent provision or provisions of this Agreement shall be curtailed, limited or eliminated to the extent necessary to remove such conflict, and as so modified, this Agreement shall continue in full force and effect. In the event that one or more of the provisions of this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be in any way affected or impaired thereby.

7. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be fully performed therein. Any and all disputes, claims, controversies and actions hereunder shall be resolved by private, confidential arbitration in New York, NY pursuant to the rules of JAMS. Each party shall have a right of appeal to a three-arbitrator panel, which appeal shall also be conducted by private, confidential arbitration in accordance with the rules of JAMS.

MD ACKNOWLEDGES THAT SHE HAS CAREFULY READ THIS AGREEMENT, UNDERSTANDS IT, AND IS VOLUNTARILY ENTERING INTO IT OF HER OWN FREE WILL, WITHOUT DURESS OR COERCION, AFTER DUE CONSIDERATION OF ITS TERMS AND CONDITIONS. MD FURTHER ACKNOWLEDGES THAT EXCEPT AS STATED IN THIS AGREEMENT, NEITHER DLH NOR ANY REPRESENTATIVE OF DLH HAS MADE ANY OTHER REPRESENTATIONS OR PROMISES TO HER.

SUBJECT TO FURTHER REVIEW BY MD'S RETD DRAV ATTORNEY

_____        _____
Milana Dravnel                   Oscar De La Hoya
                                 By Stephen Espinoza, Authorized Representative
Date: _____         Date: 9/28/07

AGREED AND ACCEPTED, AS TO THE CONFIDENTIALITY PROVISIONS OF PARAGRAPH 3 ONLY:

_____
Richard Rubino

-2-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MILANA DRAVNEL,

                        Plaintiff,                  **DECLARATION OF**
                                                          **RICHARD RUBINO**
    -against-

OSCAR DE LA HOYA, and
JOHN and/or JANE DOES 1 & 2,               Hon. Laura T. Swain
                                                         Case No.: 07-cv-10406
                        Defendants.

-------------------------------------------------------------X

       I, RICHARD RUBINO, declare as follows:

1.      I am a friend of the Plaintiff, Milana Dravnel. I am not an attorney.

2.      On September 23, 2007, I accompanied the Plaintiff, Milana Dravnel, to Manhattan to meet with representatives of the Defendant, Oscar De La Hoya.

3.      The purpose of the meeting was to negotiate an agreement between Ms. Dravnel and Mr. De La Hoya regarding digital photographs in Ms. Dravnel's possession of Mr. De La Hoya dressed in women's clothing.

4.      Mr. De La Hoya's representatives introduced themselves as Stephen Espinoza, an attorney, and Glen Bunting, a publicist from the public relations firm Sitrick and Company.

5.      Ms. Dravnel told attorney Stephen Espinoza and Glen Bunting many times that the photos were authentic and real.

6.      During the meeting, attorney Stephen Espinoza stated to Ms. Dravnel and me that he, Stephen Espinoza, was speaking on the telephone with Mr. De La Hoya and another attorney, both of whom were present in California.

7.  During the meeting, Attorney Stephen Espinoza presented approximately four drafts of the agreement while we were all present.

8.  In one draft of the agreement, attorney Stephen Espinoza included a provision requiring any disputes relating to the agreement be resolved in California under California law. I objected outright to that. Espinoza then inserted a provision that all matters would be resolved in arbitration under JAMS. I asked him what "JAMS" was, and he said that JAMS was the law in New York. I then asked for time to consider arbitration. After considering it, I objected to arbitration and demanded that all disputes be resolved in New York and in court and not in arbitration.

9.  With regard to Mr. Espinoza's assertion that I requested that all disputes be resolved in "dispute resolution" in New York, this is false. I did not even know what "dispute resolution" was until this lawsuit.

10. Not only did I not agree to arbitration, I specifically told Mr. Espinoza that I would not agree to arbitration and that I wanted any disputes to remain in New York courts. It was my understanding that any provision requiring arbitration had been deleted from the document.

11. Attorney Stephen Espinoza presented a final agreement for Ms. Dravnel to sign regarding the photographs of Mr. De La Hoya dressed in women's clothing.

12. Ms. Dravnel did not want to sign the agreement at that time, and specifically told attorney Stephen Espinoza that she did not want to sign it until her attorneys had a chance to review it.

2

13.     Attorney Stephen Espinoza stated that he and Glen Bunting were leaving for California the next day, September 24, 2007, and that if Ms. Dravnel were going to sign the agreement, she would have to do it that day, September 23, 2007.

14.     Ms. Dravnel and I left the meeting without having signed the agreement.

15.     Ms. Dravnel and I later returned to attorney Stephen Espinoza's hotel. At that time, Ms. Dravnel and I made it very clear that to Mr. Espinoza that she would sign the document with the understanding that it would not be legally binding until Ms. Dravnel's attorney reviewed and approved it. That is why, prior to Ms. Dravnel signing the document, <u>Mr. Espinoza wrote above Ms. Dravnel's signature line "SUBJECT TO FURTHER REVIEW BY MD'S ATTORNEY."</u> Thereafter, Ms. Dravnel signed the document.

16.     I categorically deny Mr. Espinoza's statements that Ms. Dravnel and I wanted to "show the agreement to an attorney solely for the purpose of seeing if any language needed to be clarified."

17.     Further, Mr. Espinoza is incorrect in stating that I said that he would "hear from an attorney the next morning only if there were language issues." I never said that. At the time, Ms. Dravnel did not even have an attorney, but was attempting to locate one.

18.     In his Declaration, Mr. Espinoza concludes that there was no doubt that Ms. Dravnel "would be speaking to an attorney only for the purpose of determining if any language changes were needed to clarify the agreement" and that Mr. Espinoza would hear from the attorney "only if there were any drafting issues." Mr. Espinoza's conclusions are false.

3

19. I find it difficult to find truth in Mr. Espinoza's statements. I specifically told Mr. Espinoza that there was no agreement until Ms. Dravnel's attorney reviewed it and signed off on it. I told Mr. Espinoza that I was not an attorney, and that Ms. Dravnel needed an attorney to look at it.

20. In drafting the document, Mr. Espinoza, a lawyer, told me he was consulting with at least one other attorney in California. If Mr. Espinoza had to consult with a lawyer during the drafting of the document, surely Ms. Dravnel, a layperson, wanted the opinion of at least one attorney before she became legally bound by the agreement.

21. I would never have used terms such as "drafting issues" or "language issues." These are things an attorney would say, not a retired police officer such as myself. Further, if all we were concerned about were "language" issues, I could have run a spell-check or grammar-check and not worried about getting an attorney to review the document.

22. Lastly, it would make no sense for Ms. Dravnel and I to agree to just have an attorney review the "language" without having any ability to change the content of the document to further protect Ms. Dravnel.

23. It was made 100% crystal clear to Mr. Espinoza that Ms. Dravnel was signing the agreement, subject to her attorney's approval and review, because Mr. Espinoza was leaving the next day. At all times, it was made very clear that this was not an agreement until after Ms. Dravnel's attorney signed off on it

24. A copy of the agreement referred to herein is attached as <u>EXHIBIT "1"</u>.

25. To the best of my knowledge, Ms. Dravnel's attorneys have never approved the agreement.

26.   As we left, there was no doubt that we did not have a deal until Ms. Dravnel's attorney reviewed it. That was said, stated and comprehended by Mr. Espinoza, Ms. Dravnel and myself.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 25th day of February 2008, in New York County, New York.

RICHARD RUBINO

5

EXHIBIT 1

## AGREEMENT

The following sets forth the terms of the agreement ("Agreement"), dated as of September 22, 2007, between Malina Dravnel ("MD") and Oscar De La Hoya ("DLH"). In consideration of the reciprocal commitments and mutual benefits hereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. MD acknowledges that she, on her own initiative, approached DLH's representatives and initiated the discussions which have resulted in this Agreement. MD acknowledges that the purpose for initiating contact with DLH's representative was to advise them of her intention to publicly recant and retract her prior public statements regarding DLH and to publicly announce that the images that had been previously posted to the internet had been taken from MD's camera by a third party without her consent and had been altered and to seek DLH's consent and approval of her public statement(s) (the "Statements"). MD acknowledges that she has not requested, nor has DLH agreed, to pay or to cause any other party to pay to her any financial compensation in connection with this Agreement or otherwise.

2. MD represents and warrants that she has not entered into any agreement with any third party regarding DLH, or any photograph or image purporting to depict DLH other than X17. Pursuant to MD's request, but subject to MD actually publicly making the Statements as mutually agreed by MD and DLH, DLH: (a) shall indemnify MD against all legal fees paid or incurred by MD for the defense of any third party lawsuit, whether filed domestically and/or internationally, against MD at any time after the date hereof claiming that the Statements constitute a breach of an agreement between MD and a third party; and (b) agrees not to file or pursue any lawsuit against MD arising out of any publication of photographs or interviews given by MD which occurred prior to the date hereof. MD agrees not to file or pursue any lawsuit against DLH arising out of any matter which has occurred prior to the date hereof.

3. MD shall keep this Agreement and the terms hereof strictly confidential. Without limiting the generality of the foregoing, MD shall not use, divulge, disseminate, discuss, refer to or acknowledge the existence of, publish, reproduce or otherwise disclose, or authorize or permit any third party to do any of the above) (i) this Agreement or the terms thereof; (ii) any information regarding DLH; or (iii) any photographs or images of DLH. In addition, after the date hereof MD shall not, without DLH's prior written consent, grant or participate in any interviews or articles, make any public statement or otherwise discuss or divulge any information regarding DLH. In the event of any breach or violation by MD of the terms of this Paragraph 3, then DLH shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $25,000 for each violation hereof. Likewise in the event of any breach or violation by DLH of DLH's obligations pursuant to Paragraph 2, then MD shall be entitled to, as liquidated damages and not as a penalty, and in addition to any other remedy, the sum of $250,000 for each violation hereof. In addition, MD agrees that In the event of any breach, alleged breach or violation of the terms of this Paragraph 3, then DLH shall sustain irreparable damage and damage which is difficult, and DLH shall therefore be entitled to injunctive and/or other equitable remedy to prevent and/or remedy any such breach or violation, and MD agrees not to oppose any such injunctive or other equitable remedy.

4. Notwithstanding anything to the contrary contained herein, and without prejudice to any other remedies set forth herein or otherwise at law or in equity, DLH's obligations under Paragraph 2

shall be null and void, and DLH shall be fully released from all of his covenants and obligations thereunder, in the event of any breach, alleged breach or violation by MD of the terms of Paragraphs 2 or 3 above.

5.  This is the entire agreement between MD and DLH regarding the subject matter hereof. MD acknowledges that neither DLH nor any other party has made any promises to her other than those contained in this Agreement. This Agreement may not be amended or modified in any way, except pursuant to a written instrument signed by both parties. MD acknowledges that she has been advise to consult with an attorney before signing this Agreement and that she has had a reasonable opportunity to do so.

6.  Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any applicable law, rule or regulation, and if there shall exist any conflict between any provision of this Agreement and any such law, rule or regulation, the latter shall prevail and the pertinent provision or provisions of this Agreement shall be curtailed, limited or eliminated to the extent necessary to remove such conflict, and as so modified, this Agreement shall continue in full force and effect. In the event that one or more of the provisions of this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be in any way affected or impaired thereby.

7.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be fully performed therein. Any and all disputes, claims, controversies and actions hereunder shall be resolved by private, confidential arbitration in New York, NY pursuant to the rules of JAMS. Each party shall have a right of appeal to a three-arbitrator panel, which appeal shall also be conducted by private, confidential arbitration in accordance with the rules of JAMS.

MD ACKNOWLEDGES THAT SHE HAS CAREFULY READ THIS AGREEMENT, UNDERSTANDS IT, AND IS VOLUNTARILY ENTERING INTO IT OF HER OWN FREE WILL, WITHOUT DURESS OR COERCION, AFTER DUE CONSIDERATION OF ITS TERMS AND CONDITIONS. MD FURTHER ACKNOWLEDGES THAT EXCEPT AS STATED IN THIS AGREEMENT, NEITHER DLH NOR ANY REPRESENTATIVE OF DLH HAS MADE ANY OTHER REPRESENTATIONS OR PROMISES TO HER.

SUBJECT TO FURTHER REVIEW BY MDS RETND ATTORNEY

_____
Milana Dravnel

Date: _____

_____
Oscar De La Hoya
By Stephen Espinoza, Authorized Representative
Date: 9/28/07

AGREED AND ACCEPTED, AS TO THE CONFIDENTIALITY PROVISIONS OF PARAGRAPH 3 ONLY:

_____
Richard Rubino

-2-